**Richard Q. Nye, Ltd.**
Richard Q. Nye 003831
Benjamin J. Branson 029233
9141 E. Hidden Spur Trail, Suite 105
Scottsdale, Arizona 85255
Phone: 602.712.9900; Fax: 602.926.2584
e-mail: nye@nyeltd.com
        bbranson@nyeltd.com
Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| EJM KYRENE PROPERTY LLC, an Arizona limited liability company, | **Case No. 2:13-at-99912** |
| Plaintiff, | |
| v. | **COMPLAINT** |
| KTR PROPERTY TRUST I, a Maryland real estate investment trust; TEMPE KYRENE LLC, a Delaware limited liability company; A. DONALD CHASE, JR.; JOHN DICOLA; TARIQ KHAN, | (Breach of Contract; Breach of Covenant of Good Faith and Fair Dealing; Unjust Enrichment; Constructive Trust; Breach of Fiduciary Duty; Tortious Interference With Contract and/or Business Expectancy; Conversion; Declaratory Relief) |
| Defendants. | |

Plaintiff, EJM Kyrene Property LLC, an Arizona limited liability company ("Plaintiff") alleges as follows:

## PARTIES

1.      Plaintiff is an Arizona limited liability company authorized to conduct business in the State of Arizona.

2.      Defendant KTR Property Trust I, ("KTR") is a Maryland real estate investment trust which has caused events to occur in the State of Arizona out of which this action arises.

3.      Defendant Tempe Kyrene LLC, ("TK LLC") is a Delaware limited liability company, authorized to conduct business in the State of Arizona.

4.      Defendant A. Donald Chase, Jr. ("Chase"), is, upon information and belief, a resident of New York, who has caused events to occur in Maricopa County, Arizona, out of which these claims arise.

5.      Defendant John DiCola ("DiCola") is, upon information and belief, a resident of New York, who has caused events to occur in Maricopa County, Arizona, out of which these claims arise.

6.      Defendant Tariq Khan ("Khan") is, upon information and belief, a resident of New York, who has caused events to occur in Maricopa County, Arizona, out of which these claims arise.

7.      Each Defendant, at all relevant times, was acting as the agent or employee of each other Defendant, in the course and scope or their agency, employment or authority.

**JURISDICTION**

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1) and (3) because the parties are diverse and the amount in controversy exceeds $75,000.00, excluding interest and costs.

9.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to this claim occurred in Maricopa County, Arizona.

**FACTUAL ALLEGATIONS**

10.      On December 10, 2010 Plaintiff, as Seller, and Defendant KTR, as Purchaser, entered into a Purchase and Sale Agreement ("Purchase Contract") whereby Plaintiff agreed to sell to KTR fifteen of Plaintiff's industrial properties ("Portfolio") located throughout the United States for a purchase price of One Hundred Thirty Six Million Dollars ($136,000,000.00).

11.     One of the properties in the in the Portfolio consisted of five buildings located at 8240, 8270, 8350, 87380 and 8410 S. Kyrene Rd., City of Tempe, Arizona, commonly known as Kyrene Commerceplex ("Kyrene Property").

12.     The term of the Purchase Contract was extended from time to time by numbered amendments.

13.     During the term of the Purchase Contract the purchaser, Defendant KTR, raised a concern that the Kyrene Property might have an environmental issue.

14.     Plaintiff and KTR entered into a Fourth Amendment which, among other things, stated the environmental concern and separated the Kyrene Property from the Portfolio for certain purposes to allow evaluation of the environmental issue.

15.     The Fourth Amendment assigned a purchase price of Nineteen Million Dollars ($19,000,000.00) to the Kyrene Property.

16.     The Fourth Amendment also allowed KTR 210 additional days for the further evaluation and provided the period could be unilaterally extended by KTR for an additional 90 days.

17.     At the end of the 210 day evaluation period, KTR claimed to have continued to be concerned about the environmental issue, and did not exercise its right to extend the evaluation period for the additional 90 day term.

18.     Thereafter, KTR gave notice (the "Termination Notice") terminating the Purchase Contract as to the Kyrene Property.

19.     KTR nonetheless offered, in its Termination Notice, to reinstate the Purchase Contract provided Plaintiff reduced the purchase price by One Million Dollars ($1,000,000.00).

20.     Thereafter, Plaintiff and KTR agreed, by the Eleventh Amendment, Exhibit A hereto, to reinstate the Purchase Contract as to the Kyrene Property, without any decrease in the

purchase price, allowing KTR to keep the property under contract and its ability to purchase alive.

21.    The Eleventh Amendment provided Plaintiff and KTR would have 60 days during which to address KTR's environmental concerns.  At the end of the 60 days, Plaintiff and KTR would attempt to negotiate a new purchase agreement for the Kyrene Property.  If, by the end of that 60 day period, January 7, 2012, KTR was still not satisfied and the parties had not entered into a new purchase agreement, Plaintiff, was given the unilateral right to terminate the Purchase Contract.

22.    The 60 day period was extended 8 times, each for an additional 30 day period, the last of which expired September 5, 2012.

23.    At that point the Kyrene Property had been tied up for approaching 2 years and the parties had not entered into a new purchase agreement.  Plaintiff exercised the election pursuant to the Eleventh Amendment and terminated the Purchase Contract by giving the required notice to KTR.

24.    At the time of the Purchase Contract the Kyrene Property was subject to a loan ("Loan") in the original principal amount of $17,545,000.00.  The Loan had an original maturity date of July 10, 2012.

25.    The lender's position under the Loan was assigned through successive transactions to a securitization pool known as TIAA Seasoned Commercial Mortgage Trust 2007-CA ("Lender") with U.S.  Bank National Association as the ultimate Trustee of the Trust.

26.    As of the date of the Purchase Contract, Lender was the holder of the Promissory Note ("Note") evidencing the Loan and was Beneficiary under the Deed of Trust ("Deed of Trust") securing the Loan.

27.    A full, true and correct copy of the Note is attached hereto as Exhibit B.

4

28.     A full, true and correct copy of the Deed of Trust, recorded June 26, 2002 in the official records of Maricopa County at Instrument No. 20020647149, is attached hereto as Exhibit C.

29.     KTR acknowledged and agreed in the Eleventh Amendment that Plaintiff intended to negotiate with Lender for extension of the maturity date, that Plaintiff would have no obligation to advise KTR of the status or seek KTR's consent and that KTR would not interfere with those negotiations.

30.     In reliance on the provisions of the Eleventh Amendment, Plaintiff entered into negotiations with Lender for extension of the maturity date. Those negotiations continued for some months.

31.     Ultimately, Lender agreed the maturity date would be extended on a month to month basis so long as Plaintiff continued to make the regular monthly payment due under the Loan.

32.     Plaintiff continued to make timely and full payments and Lender prepared a terms sheet to memorialize the terms of an extension.

33.     Following Plaintiff's delivery to KTR of the notice finally terminating the Purchase Contract, Defendant Dicola and KTR were furious and expressed deep anger that Plaintiff would not continue to tie up the Kyrene Property.

34.     Without the knowledge or consent of Plaintiff, Defendants, with the intention of interfering with Plaintiff's relationship with Lender to the end of forcing Plaintiff to sell the Kyrene Property to it, Defendants used their knowledge gained from the Confidential Information to negotiate the purchase of the Loan from Lender.

35.     On or before October 19, 2012, KTR formed TK LLC.

36.     KTR gave the Confidential Information to TK LLC and for its benefit as well as, on behalf of TK LLC, negotiated and purchased the Loan from Lender.

37.     Immediately thereafter, on or about October 25, 2012, Lender delivered a letter to Plaintiff headed "Servicing Hello/Goodbye Letter" advising Plaintiff the Note and Deed of Trust had been sold to TK LLC.

38.     On November 8, 2012, TK LLC, through it Senior Vice President, Chase, wrote to Plaintiff demanding Plaintiff provide financial information to TK LLC.

39.     On or before November 10, 2012, Plaintiff made its regular monthly payment to TK LLC.

40.     The check for the November 10, 2012 payment was received and negotiated by TK LLC and the November 10, 2012 payment was accepted by TK LLC.

41.     The next regular payment was, therefore, not due until December 10, 2012.

42.     On November 14, 2012, Plaintiff told TK LLC, DiCola and Khan that it would like to complete a longer term extension, however, that if TK LLC was not willing to enter into a longer term extension, Plaintiff was prepared to immediately pay the Note in full.

43.     On November 15, 2012, Plaintiff wrote to TK LLC summarizing their discussion of November 14, 2012 and requested TK LLC provide a customary payoff statement ("Payoff Statement") of the amount required to satisfy the Note and obtain a release and reconveyance of the Kyrene Property from the lien of the Deed of Trust ("Release").

44.     On November 26, 2012, when the Note was not in default, Chase answered the Payoff Request stating it had TK LLC had declared a default at some unspecified date and that it TK LLC was giving notice to Plaintiff only "as a courtesy".

45.     TK LLC's November 26, 2012, letter went on to state that TK LLC intended to contact Plaintiff's tenants, wrongfully telling them the Note was in default and direct them to pay their rent payments to TK LLC.

46.     TK LLC's November 26, 2012 letter further included a false and maliciously computed Payoff Statement requiring Plaintiff pay outrageous, unconscionable and unlawful

penalties as extortion in order for Plaintiff to obtain the Release and prevent TK LLC from slandering Plaintiff to Plaintiff's tenants and business associates.

47.     TK LLC's Payoff Statement not only demanded the principal amount remaining due, $14,932,116.95, but TK LLC also demanded the following, none of which were due:

     a.  Although regular monthly interest had been timely paid and accepted by TK LLC and its predecessors, TK LLC demanded an interest penalty going back to July 2012 in the amount of $187,386.70; and

     b.  Although the next regular payment was not due until December 2012, TK LLC demanded another interest penalty for the month of November 2012 in the amount of $93,781.00; and

     c.  Inexplicably, since TK LLC was claiming the principal was overdue, TK LLC demanded a pre-payment penalty of $601,967.84; and

     d.  On top of the interest penalties, TK LLC demanded an additional late fee penalty of $752,459.80; and

     e.  Even though TK LLC had owned the Note for only thirty days, had first contact with Plaintiff only twelve days before and did nothing to enforce the Note, TK LLC demanded legal fees and enforcement costs of $19,821.00.

48.     TK LLC's Payoff Statement failed to account to Plaintiff for the amount of $135,090.37, which represents Plaintiff's funds maintained in a separate, segregated tax impound account held by TK LLC and its predecessor for the benefit of Plaintiff ("Tax Impound Account").

49.     Plaintiff promptly and clearly disputed Defendants outrageous Payoff, provided the correct computation under the terms of the Loan and offered to immediately pay the correct amount.

50.     TK LLC stated that it would not accept tender of the amount computed by Plaintiff.

51.     Plaintiff could not risk the harm which would certainly result if TK LLC published its defamation that Plaintiff was in default and persisted in interfering with Plaintiff's business relationships.

52.     On November 30, 2013, in order to mitigate its damages, Plaintiff, clearly stating it was tendering payment under protest, paid the entire amount demanded by TK LLC.

53.     TK LLC has never accounted to Plaintiff for the Tax Impound Account and has converted the account to its own use.

54.     Pursuant to the Loan documents, TK LLC breached and defaulted by failing to Provide the Release in return for the payment properly due under the Loan.

55.     The Loan provides Plaintiff is entitled to interest on all sums paid to TK LLC in excess of amounts properly due, at the default rate provided in the Note and Deed of Trust.

56.     In the event Default is entered hereunder for a Defendant's failure to answer, Plaintiff is entitled to recover its reasonable attorneys' fees against such Defendant in the sum of $7,000.00.

57.     This action arises out of contract and Plaintiff is entitled to recover its attorney's fees pursuant to the Loan documents and/or A.R.S. §12-341.01(A) as applicable.

58.     Each allegation, statement and claim set forth in this Complaint is hereby incorporated in each other allegation, statement and claim as set forth in full.

## COUNT ONE

59.     Plaintiff fully performed its obligations under the Note or such obligations were waived.

60.     Defendant TK LLC breached and defaulted under its obligations under the Loan by, including but not limited to: accelerating the Loan, requiring Plaintiff pay sums not owed in order to obtain the Release and avoid Defendant TK LLC's defamation and interference with its business interests, and failing to pay the Impound Account to Plaintiff.

61.     As a direct and proximate result of Defendant TK LLC's conduct, Plaintiff suffered damages in an amount to be determined at trial but no less than $1,666,535.60, together with the amount of the Tax Impound Account.

62.     Under the terms of the Loan documents, Plaintiff is entitled to interest on its damages from the date incurred to the date of payment at the default interest rate provided by the Loan documents.

## COUNT TWO

63.     There is implicit in every contract an implied covenant of good faith and fair dealing.  In addition, persons in a special relationship of trust have a further duty of absolute good faith and fair dealing.

64.     By accepting delivery and conveyance of the Confidential Information KTR undertook a special relationship of trust with Plaintiff, requiring KTR to, among other things, protect and maintain the confidential character of the information and not use the information outside of the terms of that trust.

65.     Defendants Chase, Dicola and Khan knew of the duty owed by KTR and TK LLC and personally and through others formulated and executed the acts complained of herein.

66.     KTR used and disseminated the Confidential Information for its own benefit to the substantial harm of Plaintiff contrary.

67.     Upon becoming the owner of the Note and beneficiary under the Deed of Trust, Defendant TK LLC undertook the special relationship of Lender and the duty of good faith and fair dealing to Plaintiff.

68.     Defendant TK LLC breached of its duty of good faith and fair dealing by, including but not limited to: refusing to grant the Release unless Plaintiff complied with its wrongful demands, threatening to interfere with Plaintiff's business relations with its tenants, threatening to defaming Plaintiff.

69.     The Defendants' conduct was done in breach of their contracts with Plaintiff, with an evil mind with the intention to financially benefit Defendant and with the intention to harm Plaintiff or with knowledge that such actions were likely to cause unreasonable, unjustified and significant damage to Plaintiff.

70.     As a direct and proximate result of Defendant's wrongful conduct, Plaintiff has suffered damages in an amount to be determined at trail but no less than $1,666,535.60.

71.     Under the terms of the Loan documents, Plaintiff is entitled to interest on its damages from the date incurred to the date of payment at the default interest rate provided by the Loan documents.

72.     As a result of Defendants' outrageous conduct Plaintiff is entitled to punitive and exemplary damages in an amount found by the Jury to be sufficient to punish persons of Defendants wealth and standing and deter future similar conduct by others.  Plaintiff believes that amount should not be less than ten percent (10%) of Defendants' total wealth, as proven at trial.

…

…

## COUNT THREE

73.     Defendant TK LLC wrongfully demanded and received sums not owed under the Note.

74.     To mitigate its damages, Plaintiff paid the excess.

75.     It would be unjust to permit TK LLC to retain such sums.

76.     Defendant TK LLC wrongfully took and converted the amount held in the Tax Impound Account for its own benefit.

77.     Defendant TK LLC has been unjustly enriched at Plaintiff's expense to the extent of such payments and amount held in the Tax Impound Account.

78.     Plaintiff is entitled to recover an amount equal to all sums paid in excess of amounts strictly required by the Note and the funds held in the Tax Impound Account.

79.     Plaintiff is entitled to interest on its damages from the date incurred to the date of payment at the default interest rate provided by the Loan documents.

## COUNT FOUR

80.     The monies paid to Defendant TK LLC under protest remained the funds of Plaintiff and have been wrongfully retained by Defendant TK LLC, including the funds held in the Tax Impound Account.

81.     In equity and justice, Plaintiff is entitled to have a constructive trust imposed upon such monies.

82.     Plaintiff is entitled to an order of this Court requiring Defendant TK LLC to account for, surrender and disgorge the monies and all proceeds therefrom found to have been paid under protest and wrongfully retained by Defendant TK LLC.

83.     Plaintiff is entitled to trace the monies wrongfully retained by Defendant TK LLC.

## **COUNT FIVE**

84.     Defendant TK LLC owed a fiduciary duty of trust and responsibility to Plaintiff to maintain the Tax Impound Account for the sole benefit of Plaintiff.

85.     Defendants owed a fiduciary of trust and responsibility to Plaintiff to maintain and return the Confidential Information and not to wrongfully use such information for their own benefit.

86.     Defendants breached their fiduciary duty to Plaintiffs.

87.     As a direct and proximate Defendants have caused damage to Plaintiff in an amount to be proven at trial.

88.     The conduct of Defendants was intentional, willful and reckless and was done with an evil mind to serve its own interests, and/or to aid, abet and achieve the intent of the other defendants to cause harm, spite, ill will, malice, and or with a conscious disregard of the harmful consequences to Plaintiff.

89.     Defendants had reason to know and consciously disregarded the substantial risk that its conduct might significantly injure the rights of Plaintiff, and consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to Plaintiff.

90.     Plaintiff is entitled to an order of this Court requiring Defendant TK LLC to account for, surrender and disgorge the monies and all proceeds wrongfully retained by Defendant TK LLC, in breach of its fiduciary duty owed to Plaintiff.

91.     As a result of Defendants' outrageous conduct Plaintiff is entitled to punitive and exemplary damages in an amount found by the Jury to be sufficient to punish persons of

Defendants wealth and standing and deter future similar conduct by others.  Plaintiff believes that amount should not be less than ten percent (10%) of Defendants' total wealth, as proven at trial.

## COUNT SIX

92.     Plaintiff had a valid contract and/or business expectancy with the Lender, of which Defendants had knowledge by virtue of the Purchase Contract.

93.     Defendants, and each of them, either separately or together, or by aiding and abetting the other, intentionally induced or caused the termination of the contractual and/or business expectancy between Plaintiff and the Lender by improperly disrupting the extension and/or refinance of the Loan, and otherwise improperly acquiring the Note and Deed of Trust from the Lender.

94.     The conduct of defendants was intentional, improper and constituted willful misconduct, to cause harm, spite, ill will, malice and or a conscious disregard of the harmful consequences to Plaintiff.

95.     As a result of defendants intentional and improper interference with Plaintiff's contractual and/or business expectancy, Plaintiff has suffered damages in an amount to be proven at trial, but in no event less than $16,598,652.55.

96.     As a result of Defendants' outrageous conduct Plaintiff is entitled to punitive and exemplary damages in an amount found by the Jury to be sufficient to punish persons of Defendants wealth and standing and deter future similar conduct by others.  Plaintiff believes that amount should not be less than ten percent (10%) of Defendants' total wealth, as proven at trial.

…

**COUNT SEVEN**

97.     Defendants, together or separately, or by aiding and abetting the other, wrongly converted the confidential and highly sensitive business and loan-related information obtained through the Purchase Agreement that rightfully belongs to Plaintiff.

98.     Defendants, together or separately, or by aiding and abetting the other, wrongfully converted Plaintiff's Tax Impound Account.

99.     As a direct and proximate result, Plaintiff has been damaged in an amount to be proven at trial, but in no event less than $16,598,652.55.

100.    The conduct of defendants was intentional, improper and constituted willful misconduct, to cause harm, spite, ill will, malice and or a conscious disregard of the harmful consequences to Plaintiff.

101.    As a result of Defendants' outrageous conduct Plaintiff is entitled to punitive and exemplary damages in an amount found by the Jury to be sufficient to punish persons of Defendants wealth and standing and deter future similar conduct by others.  Plaintiff believes that amount should not be less than ten percent (10%) of Defendants' total wealth, as proven at trial.

**COUNT EIGHT**

102.    TK LLC has maintained the interpretation of the Loan which has resulted in the excessive payment extorted from Plaintiff to obtain the Release and free it from the threat of defamation.

103.    Plaintiff has maintained the interpretation of the Loan which would, in every instance result in the Payoff being in the amount offered by Plaintiff.

104.     A justiciable controversy exists as to the proper interpretation of the terms of the Loan and Plaintiff is entitled to a declaration of the terms of the Loan

## **DEMAND FOR TRIAL BY JURY**

105.     Plaintiff hereby makes demand for trial by jury.

**WHEREFORE**, Plaintiff prays Judgment against Defendants as follows:

a.     For damages in an amount to be proven at trial but in no event less than $1,655,387.33;

b.     For recovery of funds retained by Defendant TK LLC in the Tax Impound Account or damages in the amount thereof;

c.     For interest at the default rate provided by the Loan documents from the date Plaintiff incurred its damages until paid;

d.     For an accounting and payment of all amounts wrongfully received by Defendants together with all profits and benefits derived therefrom by Defendant TK LLC;

e.     For an order tracing and directing payment over to Plaintiff of any accounts or property derived by Defendant TK LLC from Plaintiff's monies wrongfully retained by Defendant TK LLC;

f.     For punitive and exemplary damages in an amount found by the Jury to be sufficient to punish persons of Defendants wealth and standing and deter future similar conduct by others.   Plaintiff believes that amount should not be less than ten percent (10%) of Defendants' total wealth, as proven at trial;

g.     For costs, expenses, and expert witness fees incurred;

h.     For pre-judgment and post-judgment interest at the legal rate to the extent interest cannot be recovered at the contract default rate;

i.      For Plaintiff's reasonable attorney fees and costs pursuant to the Loan documents and/or A.R.S. §§ 12-341.01 and 12- 349, and as otherwise provided by law; and

j.      For any other relief the Court deems just and proper.

DATED this 31st day of December, 2013.

**RICHARD Q. NYE, LTD.**


By  _/s/ Richard Q. Nye_
       Richard Q. Nye
       Benjamin J. Branson
       Attorney for Plaintiff

# EXHIBIT A

## REINSTATEMENT OF AND ELEVENTH AMENDMENT TO
## PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS

**THIS REINSTATEMENT OF AND ELEVENTH AMENDMENT TO PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS** (this "**Amendment**") is made and entered into this *3rd* day of November, 2011, by and between **EJM DEVELOPMENT CO.**, a California limited partnership ("**EJM**"), the "**AFFILIATED SELLER**" described on the signature page hereto (such Affiliated Seller, together with EJM, collectively, "**Seller**"), and **KTR PROPERTY TRUST I**, a Maryland real estate investment trust ("**Purchaser**").

## RECITALS:

**A.**     Purchaser and Seller entered into that certain Purchase and Sale Agreement and Joint Escrow Instructions made as of December 3, 2010, as amended by that certain First Amendment to Purchase and Sale Agreement and Joint Escrow Instructions dated January 5, 2011, that certain Second Amendment to Purchase and Sale Agreement and Joint Order Escrow Instructions dated January 7, 2011, that certain Third Amendment to Purchase and Sale Agreement and Joint Order Escrow Instructions dated January 12, 2011, that certain Fourth Amendment to Purchase and Sale Agreement and Joint Escrow Instructions dated January 14, 2011, that certain Fifth Amendment to Purchase and Sale Agreement and Joint Escrow Instructions dated January 20, 2011, that certain Sixth Amendment to Purchase and Sale Agreement and Joint Order Escrow Instructions dated February 28, 2011, that certain Seventh Amendment to Purchase and Sale Agreement and Joint Order Escrow Instructions dated April 26, 2011, that certain Eighth Amendment to Purchase and Sale Agreement and Joint Order Escrow Instructions dated May 31, 2011, that certain Ninth Amendment to Purchase and Sale Agreement and Joint Order Escrow Instructions dated June 9, 2011 and that certain Tenth Amendment to Purchase and Sale Agreement and Joint Order Escrow Instructions dated August 26, 2011 (the "**Tenth Amendment**") (as amended, the "**Agreement**"), with respect to certain real property more specifically described in the Agreement. Except as otherwise defined herein, all defined terms used herein shall have the respective meanings given in the Agreement. *( collectively, ) (and supplemented October 5, 2011 )*

**B.**     Purchaser previously exercised its unilateral right to terminate the Agreement (the "**Prior Termination**") pursuant to that certain letter from Purchaser's counsel to Seller dated October 3, 2011, (a copy of which is attached hereto as <u>Exhibit A</u> (the "**Termination Notice**").

**C.**     The Termination Notice contained certain proposed revisions to the terms of the Agreement applicable to the Kyrene Property, specifically items numbered 1 through 5 in the Termination Notice (the "**Kyrene Revised Terms**"), that were suggested by Purchaser to be incorporated into a New Amendment (as defined in the Termination Notice).

**D.**     The parties desire to reinstate the Agreement and modify certain terms and provisions of the Agreement, all as set forth herein.

## AGREEMENT:

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Seller hereby agree that, notwithstanding anything to the contrary contained in the Agreement, the Agreement is hereby amended as set forth below.

**1.**     <u>Recitals</u>.  The recitals set forth above are hereby incorporated into the body of this Amendment as if fully restated herein.

2.    **Reinstatement.**  The Agreement, as amended hereby, is hereby reinstated and shall continue in full force and effect.

3.    **Seller's Additional Study Period; Termination Rights.**  Seller shall have a period of sixty (60) days from and after the date of this Amendment (such period, the "**Seller's Additional Study Period**") to determine, in Seller's sole discretion, whether Seller desires to proceed with the sale of the Kyrene Property to Purchaser on and subject to (a) the terms of this Amendment, and (b) the Kyrene Revised Terms (the "**Kyrene Sale**").  If, at any time during the Seller's Additional Study Period, Seller determines that it does not desire to proceed with the Kyrene Sale for any reason, Seller may elect to terminate this Agreement by delivery of written notice (a "**Kyrene Disapproval Notice**") to Purchaser.  If Seller elects to proceed with the Kyrene Sale, then prior to the expiration of the Seller's Additional Study Period, Seller shall notify Purchaser in writing of such election (a "**Kyrene Approval Notice**") and Seller and Purchaser shall enter into a New Amendment incorporating the Kyrene Revised Terms.  If Seller delivers a Kyrene Disapproval Notice, or if Seller fails to deliver to Purchaser a Kyrene Approval Notice, or if Seller and Purchaser fail, for any reason and in the sole discretion of each, to execute and enter into a New Amendment, prior to the expiration of the Seller's Additional Study Period, then the Agreement shall automatically terminate, whereupon the Kyrene Deposit Portion shall be returned to Purchaser and neither party shall have any further rights, obligations or liabilities under the Agreement except as otherwise expressly set forth therein.  It is acknowledged and agreed that, notwithstanding anything to the contrary contained in the Agreement, prior to delivering a Kyrene Approval Notice, (a) Seller shall have the right to negotiate an amendment to the existing Kyrene mortgage, without any notice to or involvement by Purchaser, and (b) Seller shall have no duty or obligation, either pursuant to the Agreement or otherwise, to deliver or disclose to Purchaser any information, documents or materials concerning, pertaining to or in any way related to the Kyrene Property, including, without limitation, (i) any information or documentation which Seller has developed or obtained since the Prior Termination, or (ii) any information or documentation which Seller may develop during the Seller's Additional Study Period, or (iii) any information or documentation concerning Seller's efforts to obtain a modification of the existing Kyrene mortgage.  If Seller delivers a Kyrene Approval Notice, Seller shall deliver to Purchaser all information, materials and documentation developed or obtained by Seller relating to the Kyrene Property from and after the Prior Termination (collectively, the "**Current Kyrene Materials**").  From and after receipt of such Current Kyrene Materials, Purchaser shall have thirty (30) days to determine whether Purchaser desires to proceed with the Kyrene Sale on and subject to the terms of this Amendment and the Kyrene Revised Terms.  If Purchaser elects to proceed with the Kyrene Sale, Purchaser shall notify Seller in writing (a "**Purchaser Approval Election**") during such thirty (30) day period.  If Purchaser fails to deliver such Purchaser Approval Election, or if Purchaser delivers written notice to Seller during such thirty (30) day period electing not to proceed, then the Agreement shall terminate, the Kyrene Deposit Portion shall be returned to Purchaser and neither party shall have any further obligation or liability under the Agreement except as expressly set forth therein.

4.    **Earnest Money.**  Within three (3) business days after the date of this Amendment, Purchaser shall deposit with the Title Company the Kyrene Deposit Portion, which amount shall be held by the Title Company on the subject to the same terms and conditions contained in the Agreement relating to the Deposit.  In the event Seller delivers a Kyrene Approval Notice and the parties enter into a New Amendment, the Kyrene Deposit Portion shall be increased pursuant to the Kyrene Revised Terms.

5.    **Closing.**  Notwithstanding anything to the contrary contained in the Agreement, if Seller delivers a Kyrene Approval Notice, the parties execute a New Amendment and Purchaser delivers a Purchase Approval Election, the Kyrene Closing Date shall occur on such date as may be provided by the New Amendment.

6. **Full Force and Effect**. Except as specifically amended hereby, the Agreement remains in full force and effect and is hereby ratified by Purchaser and Seller. In the event that any of the terms or conditions of the Agreement conflict with this Amendment, the terms and conditions of this Amendment shall control. Any references to the Agreement made in any closing documents or instruments delivered at Closing shall be deemed to mean the Agreement as amended hereby.

7. **Counterparts**. This Amendment may be executed in any number of counterparts, all of which, when taken together, shall constitute one and the same instrument. A facsimile or electronic copy of this Amendment shall be deemed an original for all relevant purposes.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF,** the parties have executed this Amendment as of the date first set forth above.

**PURCHASER:**

**KTR PROPERTY TRUST I,**
a Maryland real estate investment trust

By: _____
Name: _____
Its: _____

**SELLER:**

**EJM DEVELOPMENT CO.,**
a California limited partnership

By: _____
Name: _____
Its: _____

By: _____
Name: _____
Its: _____

**AFFILIATED SELLER:**

EJM KYRENE PROPERTY LLC,
an Arizona limited liability company

By: EJM KYRENE SPE LLC,
    an Arizona limited liability company,
    its sole member

    By: EJM Development Co.,
        a California Limited Partnership,
        its sole member

        By _____
           Authorized Representative

        By _____
           Authorized Representative

EXHIBIT A

Termination Notice

BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP

200 WEST MADISON STREET, SUITE 3900
CHICAGO, ILLINOIS 60606

Michael R. Hall
(312) 629-7361
Voice Mail Ext. 4361
michael.hall@bfkn.com

Telephone (312) 984-3100
Facsimile (312) 984-3150

October 3, 2011

**VIA EMAIL AND FACSIMILE**

EJM Development Company
9061 Santa Monica Boulevard
Los Angeles, California 90069
Attn: Jon Monkarsh
Fax: (310) 278-2965

**VIA EMAIL AND FACSIMILE**

EJM Development Company
9061 Santa Monica Boulevard
Los Angeles, California 90069
Attn: Rick Obel
Fax: (310) 278-2965

Re:   Purchase and Sale Agreement and Joint Order Escrow Instructions dated December 3, 2010 (as amended from time to time, the "**Agreement**"), by and between KTR Property Trust I ("**Buyer**") and EJM Development Co. ("**Seller**")

Dear Messrs. Monkarsh and Obel:

Reference is hereby made to the Agreement; all capitalized terms used herein and not otherwise defined shall have the same meanings ascribed to such terms in the Agreement. Buyer has elected to proceed with the Kyrene Closing and, subject to the terms of this letter, hereby waives its right to deliver a Termination Notice to Seller with respect to the Kyrene Property pursuant to Section 8 of the Fourth Amendment and Section 2 of that certain Tenth Amendment to Purchase and Sale Agreement and Joint Order Escrow Instructions dated August 26, 2011; provided, however, that it Buyer's expectation and understanding that, promptly after the date hereof, Buyer and Seller will execute and enter into an amendment to the Agreement ("**New Amendment**") containing the following terms:

1)   The Kyrene Purchase Price Portion shall be reduced from $19,000,000 to $18,000,000.

2)   The New Kyrene Loan Contingency shall apply to Buyer's obligation to proceed to the Kyrene Closing, provided, that if the Kyrene lender does not agree to waive the pre-payment penalty applicable to the pre-payment of the Kyrene loan, Seller may elect, in its sole discretion, to either (i) pay any prepayment penalty required by the Kyrene lender (but net of any discount thereto offered by the Kyrene lender), or (ii) extend the Kyrene Closing until a date selected by Seller no earlier than April 12, 2012, but no later than April 20, 2012.

3)   Buyer shall assume control of all aspects of the Leasing Program for the Kyrene Property, including the engagement or termination of such Leasing Brokers as Buyer may select and Seller shall fully cooperate in such actions. Notwithstanding anything to the contrary in the Agreement, (i) any and all Leasing Costs attributable to Approved Leases for the Kyrene Property executed or entered into prior to the date of the New Amendment shall be borne by Seller, and (ii) any and all Leasing Costs

726790_2

BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP

EJM Development Company
October 3, 2011
Page 2

attributable to Approved Leases for the Kyrene Property executed or entered into after the date of the New Amendment shall be borne by Buyer.

     4)    Seller shall commence the remediation of the Existing Condition at the Kyrene Property pursuant to a work plan to be approved by Buyer and Seller.  The costs of such remediation work shall be borne by Seller, provided that Seller shall receive a credit from Buyer at the Kyrene Closing for such costs incurred after the date of the New Amendment and prior to the Kyrene Closing.  At the Kyrene Closing, Buyer shall assume control of the remediation work at the Kyrene Property.

     5)    The Kyrene Deposit Portion shall be increased from $705,000 to $2,000,000.

In the event Seller does not agree with the foregoing terms and acknowledge such agreement by executing as provided below and/or Seller and Buyer fail to reach agreement on the final form and content of the New Amendment and execute such New Amendment on or prior to October 14, 2011, then this letter shall serve as Buyer's Termination Notice to Seller, effective as of the date hereof.

We look forward to continuing this process and working with you toward a successful conclusion.

Very truly yours,

Michael R. Hall

AGREED AND ACCEPTED this ___ day of October:

EJM DEVELOPMENT CO.,
a California limited partnership

By: _____
Name: _____
Its: _____

By: _____
Name: _____
Its: _____

926690_2

BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP

EJM Development Company
October 3, 2011
Page 3


EJM KYRENE PROPERTY LLC,
an Arizona limited liability company

By:  EJM KYRENE SPE LLC,
       an Arizona limited liability company,
       its sole member

       By:  EJM Development Co.,
              a California Limited Partnership,
              its sole member

              By_____
              Name_____
              Its_____

              By_____
              Name_____
              Its_____



MRH
cc:     Robert D. Collins (via facsimile)
        John P. DiCola (via email)
        Brian Gagne (via email)
        John Clowney (via email)
        Mark J. Beaubien (via email)


726590_2

# BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP

200 WEST MADISON STREET, SUITE 3900
CHICAGO, ILLINOIS 60606

**Michael R. Hall**
(312) 629-7361
Voice Mail Ext. 4361
michael.hall@bfkn.com

Telephone  (312) 984-3100
Facsimile  (312) 984-3150

October 5, 2011

**VIA EMAIL, FACSIMILE AND**
**OVERNIGHT DELIVERY**

EJM Development Company
9061 Santa Monica Boulevard
Los Angeles, California 90069
Attn:  Jon Monkarsh
Fax: (310) 278-2965

**VIA EMAIL, FACSIMILE AND**
**OVERNIGHT DELIVERY**

EJM Development Company
9061 Santa Monica Boulevard
Los Angeles, California 90069
Attn:  Rick Obel
Fax:  (310) 278-2965

Re:   Purchase and Sale Agreement and Joint Order Escrow Instructions dated December 3, 2010 (as amended from time to time, the "**Agreement**"), by and between KTR Property Trust I ("**Buyer**") and EJM Development Co. ("**Seller**")

Dear Messrs. Monkarsh and Obel:

We understand that there may be some confusion regarding the status of the Agreement and the transactions contemplated thereby, and this letter will clarify the same.  All capitalized terms used herein and not otherwise defined shall have the same meanings ascribed to such terms in the Agreement.  On October 3, 2011, a letter (the "**Notice**") was sent to you from this office.  The Notice set forth certain conditions subsequent to Buyer's election to proceed to the Kyrene Closing, which conditions subsequent included Buyer and Seller reaching agreement on certain modifications to the Agreement and executing and entering into a New Amendment.  The Notice provided that failure of such conditions subsequent rendered the Notice a Termination Notice pursuant to the Fourth Amendment and the Tenth Amendment, which Termination Notice this office, as attorney-in-fact for Buyer, was and is authorized to deliver.  We understand that the modifications to the Agreement set forth in the Notice are not acceptable to Seller and that the parties will not be executing a New Amendment incorporating such modifications.  Therefore, the conditions subsequent to Buyer's election to proceed have failed and the Notice is deemed a Termination Notice.  Accordingly, the Agreement is terminated.

726823_1

BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP

EJM Development Company
October 5, 2011
Page 2


Although the parties are no longer under contract, Buyer remains focused on working with Seller to find an acceptable solution and business agreement for the reinstatement of the Agreement and the ultimate acquisition of the Kyrene Property by Buyer.

Very truly yours,

Michael R. Hall

MRH
cc:     Robert D. Collins (via facsimile and overnight delivery)
        John P. DiCola (via email)
        Brian Gagne (via email)
        John Clowney (via email)
        Mark J. Beaubien (via email)

726823_1

**EXHIBIT B**

Authorization I.D. #AAA0538
Investment I.D. # 000524000

## PROMISSORY NOTE

$17,545,000.00

[City and State]
Dated:_____, 2002

FOR VALUE RECEIVED, EJM KYRENE PROPERTY LLC, an Arizona limited liability company ("**Borrower**") having its principal place of business at 3550 East Post Road, Suite 200, Las Vegas, Nevada 89120, promises to pay to LEND LEASE MORTGAGE CAPITAL, L.P., a Texas limited partnership, its successors and assigns ("**Lender**"), or order, at Lender's offices at 700 North Pearl Street, Suite 2400, Dallas, Texas 75201-7424 or at such other place as Lender designates in writing, the principal sum of SEVENTEEN MILLION FIVE HUNDRED FORTY-FIVE THOUSAND AND NO/100 DOLLARS ($17,545,000.00) (the principal sum or so much of the principal sum as may be advanced and outstanding from time to time, (the "**Principal**"), in lawful money of the United States of America, with interest on the Principal from the date of this Promissory Note (this "**Note**") through and including July 10, 2012 (the "**Maturity Date**") at the fixed rate of six and nine one hundredths percent (6.90%) per annum (the "**Fixed Interest Rate**").

This Note is secured by, among other things, the Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing Statement, (the "**Deed of Trust**") dated the date of this Note made by Borrower for the benefit of Lender as security for the Loan.  All capitalized terms not expressly defined in this Note will have the definitions set forth in the Deed of Trust.

Section 1.    Payments of Principal and Fixed Interest

(a)    Borrower will make monthly installment payments of principal and interest ("**Debt Service Payments**") at the Fixed Interest Rate calculated on a thirty (30) year amortization schedule as follows:

(i)    On the date hereof, a payment of interest on the Principal at the Fixed Interest Rate for the period through July 9, 2002; and

(ii)    On August 10, 2002 and on the tenth day of each succeeding calendar month through and including the Maturity Date, payments ("**Monthly Installments**") in the amount of One Hundred Fifteen Thousand Five Hundred Fifty-One and 39/100s Dollars ($115,551.39), each of which will be applied first to accrued interest (through the ninth day of the calendar month in which such payment is being made) on the Principal at the Fixed Interest Rate and then to the Principal.

CO_DOCS_A #109503 v2

(b)     On the Maturity Date, Borrower will pay the Principal in full together with accrued interest at the Fixed Interest Rate and all other amounts due under the Loan Documents.

(c)     Interest on the principal sum of this Note shall be calculated on the basis of a three hundred sixty (360) day year composed of twelve (12) months of thirty (30) days each, except that interest due and payable for a period less than a full month shall be calculated by multiplying the actual number of days elapsed in such period by a daily rate based on said 360 day year.

Section 2.     Prepayment Provisions.

(a)     This Note may not be prepaid in whole or in part (except with respect to the application of casualty or condemnation proceeds) before August 9, 2007.  Commencing on August 10, 2007, provided there is no Event of Default, Borrower may prepay this Note in full, but not in part, on the tenth day of any calendar month (the "**Prepayment Date**"), upon sixty (60) days prior notice to Lender and upon payment in full of the Debt which will include a payment (the "**Prepayment Premium**") equal to the  greater of (i) an amount equal to the product of the Prepayment Percentage times the Prepayment Date Principal, or (ii) the amount by which the sum of the Discounted Values of Note Payments, calculated using the Discount Rate, exceeds the Prepayment Date Principal.  In order to calculate (ii) in the foregoing, each remaining Note Payment will be discounted and the resulting Discounted Values will be added together.  This Note may not be prepaid without simultaneous prepayment in full of any other notes secured by the Loan Documents.

(b)     After an Acceleration or upon any other prepayment not permitted by the Loan Documents, any tender of payment of the amount necessary to satisfy the Debt accelerated, any judgment of foreclosure, any statement of the amount due at the time of foreclosure (including foreclosure by power of sale) and any tender of payment made during any redemption period after foreclosure, will include an amount (the "**Evasion of Prepayment Premium**") equal to the greater of (i) an amount equal to the product of the Prepayment Percentage plus 300 basis points times the Prepayment Date Principal, or (ii) the amount by which the sum of the Discounted Values of the Note Payments, calculated using the Default Discount Rate, exceeds the Prepayment Date Principal. In order to calculate (ii) in the foregoing, each remaining Note Payment will be discounted and the resulting Discounted Values will be added together.

(c)     Borrower acknowledges that:

(i)     a prepayment will cause damage to Lender;

(ii)     the Evasion of Prepayment Premium is intended to compensate Lender for the loss of its investment and the expense incurred and time and effort associated with making the Loan, which will not be fully repaid if the Loan is prepaid;

(iii)    it will be extremely difficult and impractical to ascertain the extent of Lender's damages caused by a prepayment after an Event of Default or any other prepayment not permitted by the Loan Documents; and

(iv)    the Evasion of Prepayment Premium represents Lender and Borrower's reasonable estimate of Lender's damages for the prepayment and is not a penalty.

(d)    The following definitions apply:

"**Default Discount Rate**" means the Discount Rate less 300 basis points.

"**Discount Rate**" means the yield on a U.S. Treasury issue selected by Lender, as published in The Wall Street Journal, two weeks prior to prepayment, having a maturity date corresponding (or most closely corresponding, if not identical) to the Maturity Date, and, if applicable, a coupon rate corresponding (or most closely corresponding, if not identical) to the Fixed Interest Rate.

"**Discounted Value**" means the Discounted Value of a Note Payment based on the following formula:

$$\frac{NP}{(1 + R/12)n} = \text{Discounted Value}$$

NP    =    Amount of Note Payment

R    =    Discount Rate or Default Discount Rate as the case may be.

n    =    The number of months between the date of prepayment and the scheduled date of the Note Payment being discounted rounded to the nearest integer.

"**Note Payments**" means (i) the scheduled Debt Service Payments for the period from the date of prepayment through and including the Maturity Date and (ii) the scheduled repayment of Principal, if any, on the Maturity Date.

"**Prepayment Date Principal**" means the Principal on the date of prepayment.

"**Prepayment Percentage**" means one percent (1%).

(e)    If a complete or partial prepayment results from the application to the Debt of the casualty or condemnation proceeds from the Property prior to the occurrence of an Event of Default, no prepayment consideration will be imposed.  Partial prepayments of principal resulting from the application of casualty or insurance proceeds to the Debt shall not change the amounts of subsequent monthly installments nor change the dates on which such installments are due, unless Lender shall otherwise agree in writing.  Notwithstanding any provision herein to the contrary, provided there is no Event of Default, upon 30 days prior notice to Lender Borrower shall have the additional privilege to prepay the entire Principal (together with any other sums constituting the

Debt) on any scheduled payment date (i) during the three (3) months preceding the Maturity Date without any fee or consideration for such privilege.  If any such notice of prepayment is given, the Principal and the other sums required under this paragraph shall be due and payable on the selected prepayment date and other notes secured by the Loan Documents must be simultaneously prepaid in full.

Section 3.    Events of Default:

(a)    It is an **"Event of Default"** under this Note:

(i)    if Borrower fails to pay any amount due as and when required under this Note (without giving consideration to any grace period contained in the Loan Documents); or

(ii)    if an Event of Default occurs under any other Loan Document.

(b)    If an Event of Default occurs, Lender may declare all or any portion of the Debt immediately due and payable ("**Acceleration**") and exercise any of the other Remedies.

Section 4.    Default Rate.  Interest on the Principal will accrue at the Default Interest Rate from the date an Event of Default occurs.

Section 5.    Late Charges.

(a)    If Borrower fails to pay any Debt Service Payment when due or fails to pay any amount due under the Loan Documents on the Maturity Date (in either event, without giving consideration to any grace period contained in the Loan Documents), Borrower agrees to pay to Lender an amount (a "**Late Charge**") equal to five cents ($.05) for each one dollar ($1.00) of the delinquent payment.

(b)    Borrower acknowledges that:

(i)    a delinquent payment will cause damage to Lender;

(ii)    the Late Charge is intended to compensate Lender for loss of use of the delinquent payment and the expense incurred and time and effort associated with recovering the delinquent payment;

(iii)    it will be extremely difficult and impractical to ascertain the extent of Lender's damages caused by the delinquency; and

(iv)    the Late Charge represents Lender and Borrower's reasonable estimate of Lender's damages from the delinquency and is not a penalty.

Section 6.    Limitation of Liability.  This Note is subject to the limitations on liability set forth in the Article of the Deed of Trust entitled "**Limitation of Liability**".

Section 7.    WAIVERS. IN ADDITION TO THE WAIVERS SET FORTH IN THE ARTICLE OF THE DEED OF TRUST ENTITLED "WAIVERS", BORROWER WAIVES PRESENTMENT FOR PAYMENT, DEMAND, DISHONOR AND, EXCEPT AS EXPRESSLY SET FORTH IN THE LOAN DOCUMENTS, NOTICE OF ANY OF THE FOREGOING.   BORROWER FURTHER WAIVES ANY PROTEST, LACK OF DILIGENCE OR DELAY IN COLLECTION OF THE DEBT OR ENFORCEMENT OF THE LOAN DOCUMENTS.    BORROWER AND ALL ENDORSERS, SURETIES AND GUARANTORS OF THE OBLIGATIONS CONSENT TO ANY EXTENSIONS OF TIME, RENEWALS, WAIVERS AND MODIFICATIONS THAT LENDER MAY GRANT WITH RESPECT TO THE OBLIGATIONS AND TO THE RELEASE OF ANY SECURITY FOR THIS NOTE AND AGREE THAT ADDITIONAL BORROWERS MAY BECOME PARTIES TO THIS NOTE AND ADDITIONAL ENDORSERS, GUARANTORS OR SURETIES MAY BE ADDED WITHOUT NOTICE AND WITHOUT AFFECTING THE LIABILITY OF THE ORIGINAL BORROWER OR ANY ORIGINAL ENDORSER, SURETY OR GUARANTOR.

Section 8.    Lockbox Agreement. Of even date herewith Borrower, Lender and Lockbox Administrator (as defined in the Lockbox Agreement), have entered into an agreement (the "**Lockbox Agreement**") for the establishment of an account (the "**Lockbox Account**") into which all revenues from the Property will be deposited at Lender's election, upon the occurrence of an Event of Default (a "**Lockbox Event**").

(a)    Borrower shall pay all of Lender's and its servicer's costs and expenses in connection with the Lockbox Agreement, including without limitation reasonable attorney's fees and additional servicing fees (if any) customarily charged by Lender's servicer in connection with administering Lockbox Accounts. The Lockbox Agreement shall be a "**Loan Document**" for all purposes under this Note and the other Loan Documents. Lender may require Borrower to execute (or Lender may execute as Borrower's attorney-in-fact) any payment directions to the property manager and tenants of the Property (whose estoppel certificates shall acknowledge their agreement to make payments in accordance with such directions) and such additional documentation as Lender may deem necessary to institute such arrangement. In connection with a Lockbox Agreement taking effect upon an Event of Default and continuing after the Maturity Date, Lender may also require Borrower to do the following: (i) to execute an agreement in recordable form to toll or extend the applicable statute of limitations after the Maturity Date and (ii) to obtain at Borrower's expense such title policy endorsements as Lender may deem necessary to reflect such agreement.

(b)    Nothing provided above in connection with the Lockbox Account shall limit, reduce or otherwise affect Borrower's obligations under the Loan Documents, including without limitation the obligations of Borrower (i) to operate and maintain (and to pay currently all expenses to operate and maintain) the Property, (ii) to make the monthly Debt Service Payments, (iii) to fund any escrows or reserves established or required under the Loan Documents for taxes, insurance premiums, capital repairs, tenant improvements and leasing commissions or other purposes, and (iv) to pay all principal, interest and other amounts due at any time under this Note, the Deed of Trust and the other Loan Documents (all of the amounts in items (i), (ii), (iii) and (iv) of this paragraph being referred to as "**Amounts Due**"), even though the sums available in the Lockbox Account at any time from time to time may be insufficient to pay all such Amounts Due; and the failure by Borrower to

CO_DOCS_A #109503 v2

(a) pay directly and timely all Amounts Due through and including the Maturity Date and (b) deposit immediately at all times upon a Lockbox Event and thereafter such additional sums in the Lockbox Account as may be required to pay all Amounts Due and all extraordinary expenses approved in writing by Lender shall constitute an Event of Default. It is also understood that the existence or continuation of the Lockbox Account upon or after an Event of Default, including failure to pay all amount due on the Maturity Date, shall constitute neither a waiver of any of Lender's rights and remedies under the Loan Documents (including without limitation foreclosure on the Property) and applicable law (including without limitation the appointment of a receiver) nor a limitation on the exercise thereof by Lender or its designee.

Section 9.    Commercial Loan.  The Loan is made for the purpose of carrying on a business or commercial activity or acquiring real or personal property as an investment or carrying on an investment activity and not for personal or household purposes.

Section 10.    Usury Limitations.  Borrower and Lender intend to comply with all Laws with respect to the charging and receiving of interest. Any amounts charged or received by Lender for the use or forbearance of the Principal to the extent permitted by Law, will be amortized and spread throughout the Term until payment in full so that the rate or amount of interest charged or received by Lender on account the Principal does not exceed the Maximum Interest Rate. If any amount charged or received under the Loan Documents that is deemed to be interest is determined to be in excess of the amount permitted to be charged or received at the Maximum Interest Rate, the excess will be deemed to be a prepayment of Principal when paid, without premium, and any portion of the excess not capable of being so applied will be refunded to Borrower. If during the Term the Maximum Interest Rate, if any, is eliminated, then for purposes of the Loan, there will be no Maximum Interest Rate.

Section 11.    Applicable Law.  This Note is governed by and will be construed in accordance with the Laws of the state or commonwealth in which the Property is located, without regard to conflict of law provisions.

Section 12.    Time of the Essence.  Time is of the essence with respect to the payment and performance of the Obligations.

Section 13.    Cross-Default.  A default under any other note now or hereafter secured by the Loan Documents or under any loan document related to such other note constitutes a default under this Note and under the other Loan Documents. When the default under the other note constitutes an Event of Default under that note or the related loan document, an Event of Default also will exist under this Note and the other Loan Documents.

Section 14.    Construction.  Unless expressly provided otherwise in this Note, this Note will be construed in accordance with the Exhibit attached to the Deed of Trust entitled "**Rules of Construction**".

Section 15.    Deed of Trust Provisions Incorporated.  To the extent not otherwise set forth in this Note, the provisions of the Articles of the Deed of Trust entitled "**Expenses and Duty to**

Defend", "Waivers", "Notices", and "Miscellaneous" are applicable to this Note and deemed incorporated by reference as if set forth at length in this Note.

Section 16.    Joint and Several Liability; Successors and Assigns.  If Borrower consists of more than one entity, the obligations and liabilities of each such entity will be joint and several. This Note binds Borrower and successors, assigns, heirs, administrators, executors, agents and representatives and inures to the benefit of Lender and its successors, assigns, heirs, administrators, executors, agents and representatives.

Section 17.    Absolute Obligation. Except for the Section of this Note entitled "Limitation of Liability", no reference in this Note to the other Loan Documents and no other provision of this Note or of the other Loan Documents will impair or alter the obligation of Borrower, which is absolute and unconditional, to pay the Principal, interest at the Fixed Interest Rate and any other amounts due and payable under this Note, as and when required.

Section 18.    Sale of Loan by Lender.  Lender shall have the right to transfer, sell or assign this Note, the Deed of Trust and the other Loan Documents, and the Obligations hereunder.

IN WITNESS WHEREOF, Borrower has executed and delivered this Note as of the date first set forth above.

> **EJM KYRENE PROPERTY LLC,** an Arizona limited liability company
>
> By:  EJM KYRENE SPE LLC, an Arizona limited liability company, its sole member
>
> > By:  EJM Development Co., a California limited partnership, its sole member
> >
> > By: _____
> > Name: EUGENE MONICARS. H
> > Title: GENERAL PARTNER

**EXHIBIT C**

**First American**   ₃

MARICOPA COUNTY RECORDER
HELEN PURCELL
₎20647149  06/26/2002  08:50
ELECTRONIC RECORDING

After Recordation This Deed of Trust
Should Be Returned To:

1383637-69-7-4--
GonzalesJ

Gwendolyn C. Allen, Esquire
Ballard Spahr Andrews & Ingersoll, LLP
1225 17th Street, Suite 2300
Denver, Colorado 80202-5596

Investment I.D. # 000524000

257· 1383637
4ħ

## DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING STATEMENT

by and between

EJM KYRENE PROPERTY LLC,
as Borrower

and

FIRST AMERICAN TITLE INSURANCE COMPANY,
as Trustee

for the benefit of

LEND LEASE MORTGAGE CAPITAL, L.P.,
as Lender

Property Known As

Kyrene Commerceplex
8240, 9270, 8350, 87380, 8410 S. Kyrene Road
Tempe, Arizona 85284

We hereby certify that this is a true and correct copy
First American ............. Co.

By _____

CO_DOCS_A #109558 v2

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 1 of 69
Order: 1 Comment:

TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS AND RULES OF CONSTRUCTION .................................... 1
     Section 1.1 Definitions. ........................................................................................ 1
     Section 1.2 Rules of Construction. ....................................................................... 1
ARTICLE II GRANTING CLAUSES ............................................................................. 1
     Section 2.1 Encumbered Property. ....................................................................... 1
     Section 2.2 Habendum Clause. ............................................................................. 3
     Section 2.3 Security Agreement. .......................................................................... 3
     Section 2.4 Conditions to Grant. .......................................................................... 5
     Section 2.5 Cross-Collateralization, Cross-Default, and Deed of Trust Modification
           Agreement. .................................................................................................. 5
ARTICLE III OBLIGATIONS SECURED ..................................................................... 5
     Section 3.1 The Obligations. ................................................................................. 5
ARTICLE IV TITLE AND AUTHORITY ...................................................................... 5
     Section 4.1 Title to the Property. .......................................................................... 5
     Section 4.2 Authority. ........................................................................................... 6
     Section 4.3 No Foreign Person. ............................................................................ 6
     Section 4.4 Litigation. ........................................................................................... 6
ARTICLE V PROPERTY STATUS, MAINTENANCE AND LEASES ......................... 7
     Section 5.1 Status of the Property. ....................................................................... 7
     Section 5.2 Maintenance of the Property. ............................................................ 7
     Section 5.3 Change in Use. ................................................................................... 7
     Section 5.4 Waste. ................................................................................................. 7
     Section 5.5 Inspection of the Property. ................................................................ 7
     Section 5.6 Leases and Rents. ............................................................................... 8
     Section 5.7 Parking. .............................................................................................. 8
     Section 5.8 Separate Tax Lot. ............................................................................... 9
     Section 5.9 Changes in Zoning or Restrictive Covenants. ................................... 9
     Section 5.10 Lender's Right to Appear. ................................................................ 9
ARTICLE VI IMPOSITIONS AND ACCUMULATIONS ............................................. 9
     Section 6.1 Impositions. ........................................................................................ 9
     Section 6.2 Accumulations. ................................................................................ 10
     Section 6.3 Changes in Tax Laws. ...................................................................... 11
     Section 6.4 Capital Expenditures Reserves. ....................................................... 11
     Section 6.5 General Provisions - Accumulations and Reserves. ......................... 13
ARTICLE VII INSURANCE, CASUALTY, CONDEMNATION AND RESTORATION ....... 14
     Section 7.1 Insurance Coverages. ....................................................................... 14
     Section 7.2 Casualty and Condemnation. ............................................................ 15
     Section 7.3 Application of Proceeds. ................................................................... 16
     Section 7.4 Conditions to Availability of Proceeds for Restoration. ................... 16
     Section 7.5 Restoration. ...................................................................................... 18
ARTICLE VIII COMPLIANCE WITH LAW AND AGREEMENTS ........................... 19
     Section 8.1 Compliance with Law. ...................................................................... 19
     Section 8.2 Compliance with Agreements. .......................................................... 19

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 2 of 69
Order: 1 Comment:

Section 8.3 ERISA Compliance. ................................................................20
Section 8.4 Section 6045(e) Filing. ............................................................20
Section 8.5 Compliance with Anti-Terrorism Laws. ..................................20
ARTICLE IX ENVIRONMENTAL .......................................................................21
Section 9.1 Environmental Representations and Warranties. .....................21
Section 9.2 Environmental Covenants. .......................................................21
ARTICLE X FINANCIAL REPORTING ..............................................................23
Section 10.1 Financial Reporting. ..............................................................23
Section 10.2.   Certificate of Good Standing. ............................................23
ARTICLE XI EXPENSES AND DUTY TO DEFEND .........................................24
Section 11.1 Payment of Expenses. ............................................................24
Section 11.2 Duty to Defend. ......................................................................24
ARTICLE XII TRANSFERS, LIENS AND ENCUMBRANCES. ........................24
Section 12.1 Prohibitions on Transfers, Liens and Encumbrances. ............24
Section 12.2 Permitted Transfers. ...............................................................25
Section 12.3 Right to Contest Liens. ..........................................................28
ARTICLE XIII ADDITIONAL REPRESENTATIONS, WARRANTIES AND
COVENANTS. ...........................................................................................29
Section 13.1 Further Assurances. ................................................................29
Section 13.2 Estoppel Certificates. .............................................................29
Section 13.3 Single Purpose Entity. ...........................................................30
ARTICLE XIV DEFAULTS AND REMEDIES. ...................................................33
Section 14.1 Events of Default. ..................................................................33
Section 14.2 Remedies. ...............................................................................35
Section 14.3 General Provisions Pertaining to Remedies. .........................37
Section 14.4 Foreclosure by Power of Sale. ..............................................38
Section 14.5 General Provisions Pertaining to Receiver and other Remedies. ................38
Section 14.6 General Provisions Pertaining to Foreclosures and the Power of Sale. .......40
Section 14.7 Application of Proceeds. ........................................................40
Section 14.8 Power of Attorney. .................................................................41
Section 14.9 Tenant at Sufferance. .............................................................41
ARTICLE XV LIMITATION OF LIABILITY .....................................................41
Section 15.1 Limitation of Liability. ..........................................................41
ARTICLE XVI WAIVERS. ...................................................................................43
Section 16.1 WAIVER OF STATUTE OF LIMITATIONS. .....................43
Section 16.2 WAIVER OF NOTICE. ..........................................................43
Section 16.3 WAIVER OF MARSHALLING AND OTHER MATTERS. .................43
Section 16.4 WAIVER OF TRIAL BY JURY. ...........................................44
Section 16.5 WAIVER OF COUNTERCLAIM. ..........................................44
Section 16.6 WAIVER OF JUDICIAL NOTICE AND HEARING. .............44
Section 16.7 WAIVER OF SUBROGATION. .............................................44
Section 16.8 GENERAL WAIVER. .............................................................44
ARTICLE XVII NOTICES. ...................................................................................45
Section 17.1 Notices. ...................................................................................45
Section 17.2 Change in Borrower's Legal Name, Place of Business or State of
Formation. .................................................................................................46

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 3 of 69
Order: 1 Comment:

ARTICLE XVIII SECONDARY MARKET .......................................................................... 46
    Section 18.1 Dissemination of Information. .................................................................. 46
ARTICLE XIX MISCELLANEOUS ................................................................................... 47
    Section 19.1 Applicable Law. ...................................................................................... 47
    Section 19.2 Usury Limitations. ................................................................................... 47
    Section 19.3 Lender's Discretion. ................................................................................ 48
    Section 19.4 Unenforceable Provisions. ...................................................................... 48
    Section 19.5 Survival of Borrower's Obligations. ........................................................ 48
    Section 19.6 Relationship Between Borrower and Lender; No Third Party
        Beneficiaries. .................................................................................................. 48
    Section 19.7 Partial Reconveyances or Releases, Extensions, Waivers. ..................... 48
    Section 19.8 Service of Process. .................................................................................. 49
    Section 19.9 Entire Agreement. ................................................................................... 49
    Section 19.10 No Oral Amendment. ............................................................................. 49
    Section 19.11 Severability. .......................................................................................... 49
    Section 19.12 Covenants Run with the Land. ............................................................... 49
    Section 19.13 Time of the Essence. ............................................................................. 49
    Section 19.14 Subrogation. .......................................................................................... 49
    Section 19.15 Joint and Several Liability. .................................................................... 50
    Section 19.16 Successors and Assigns. ........................................................................ 50
    Section 19.17 Duplicates and Counterparts. ................................................................ 50
Exhibit A LEGAL DESCRIPTION ................................................................................... 54
Exhibit B DEFINITIONS ................................................................................................. 55
Exhibit C RULES OF CONSTRUCTION. ........................................................................ 62

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 4 of 69
Order: 1 Comment:

## DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING STATEMENT

THIS DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING STATEMENT made this 25th day of _June_ , 2002, by and between EJM KYRENE PROPERTY LLC, an Arizona limited liability company ("**Borrower**"), having its principal place of business at 7975 N. Hayden Road, Suite D-363, Scottsdale, Arizona  85258, and FIRST AMERICAN TITLE INSURANCE COMPANY ("**Trustee**"), having an office at 1030 E. Baseline Road, Suite 158, Tempe, Arizona 85283, for the benefit of LEND LEASE MORTGAGE CAPITAL, L.P., a Texas limited partnership, its successors and assigns ("**Lender**"), having an address at 700 North Pearl Street, Suite 2400, Dallas, Texas  75201-7424.

### RECITALS:

A.     Lender agreed to make and Borrower agreed to accept a loan (the "**Loan**") in the maximum principal amount of $17,545,000.00.

B.     To evidence the Loan, Borrower executed and delivered to Lender a promissory note (the "**Note**"), dated the date of this Deed of Trust, in the principal amount of Seventeen Million Five Hundred Forty-Five Thousand and No/100 Dollars ($17,545,000.00)(that amount or so much as is outstanding from time to time is referred to as the "**Principal**"), promising to pay the Principal with interest thereon to the order of Lender as set forth in the Note and with the balance, if any, of the Debt being due and payable on July 10, 2012 (the "**Maturity Date**").

C.     To secure the Note, this Deed of Trust conveys, among other things, Borrower's fee interest in the real property located in the City of Tempe, County of Maricopa, State of Arizona more particularly described in **Exhibit A** (the "**Land**").

### ARTICLE I

### DEFINITIONS AND RULES OF CONSTRUCTION

Section 1.1 _Definitions_.  Capitalized terms used in this Deed of Trust are defined in **Exhibit B** or in the text with a cross-reference in **Exhibit B**.

Section 1.2 _Rules of Construction_.  This Deed of Trust will be interpreted in accordance with the rules of construction set forth in **Exhibit C**.

### ARTICLE II

### GRANTING CLAUSES

Section 2.1 _Encumbered Property_.  Borrower irrevocably grants, mortgages, warrants, conveys, assigns and pledges to Trustee in trust, WITH POWER OF SALE, and grants to Trustee a security interest in, the following property, rights, interests and estates now or in the

CO_DOCS_A #109558 v2

future owned or held by Borrower (the "**Property**") for the uses and purposes set forth in this Deed of Trust (capitalized terms used in this Section 2.1 and not defined in this Deed of Trust have the meaning ascribed to them in the Uniform Commercial Code):

(i)     the Land;

(ii)    all buildings and improvements located on the Land (the "**Improvements**");

(iii)   all easements; rights of way or use, including any rights of ingress and egress; streets, roads, ways, sidewalks, alleys and passages; strips and gores; sewer rights; water, water rights, water courses, riparian rights and drainage rights; air rights and development rights; oil and mineral rights; and tenements, hereditaments and appurtenances, in each instance adjoining or otherwise appurtenant to or benefiting the Land or the Improvements;

(iv)    all General Intangibles (including Software) and Goods, including Fixtures, Equipment and Consumer Goods attached to, contained in or used in connection with the Land or the Improvements (excluding personal property owned by tenants);

(v)     all agreements, ground leases, grants of easements or rights-of-way, permits, declarations of covenants, conditions and restrictions, disposition and development agreements, planned unit development agreements, cooperative, condominium or similar ownership or conversion plans, management, leasing, brokerage or parking agreements or other material documents affecting Borrower or the Land, the Improvements or the Fixtures and Personal Property but expressly excluding the Leases (the "**Property Documents**");

(vi)    all Inventory held for sale, lease or resale or furnished or to be furnished under contracts of service, or used or consumed in the ownership, use or operation of the Land, the Improvements or the Fixtures and Personal Property and all Documents of title evidencing any part of any of the foregoing;

(vii)   all Accounts, Documents, Goods, Instruments, money, Deposit Accounts, Chattel Paper, Letter-of-Credit Rights, Investment Property, General Intangibles and Supporting Obligations relating to the Property, including all deposits held from time to time by the Accumulations Depositary to provide reserves for Taxes and Assessments together with interest thereon, if any (the "**Accumulations**"), the Lockbox Administrator (as defined in the Lockbox Agreement) together with interest thereon, if any, the Capital Expenditures Depositary together with interest thereon, if

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 6 of 69
Order: 1 Comment:

any, and (d) all rights in connection with the Rollover Letter of Credit;

(viii)   all awards and other compensation paid after the date of this Deed of Trust for any Condemnation (the "**Condemnation Awards**");

(ix)    all proceeds of and all unearned premiums on the Policies (the "**Insurance Proceeds**");

(x)     all licenses, certificates of occupancy, contracts, management agreements, operating agreements, operating covenants, franchise agreements, permits and variances relating to the Land, the Improvements or the Fixtures and Personal Property;

(xi)    all books, records and other information, wherever located, which are in Borrower's possession, custody or control or to which Borrower is entitled at law or in equity and which are related to the Property, including all computer or other equipment used to record, store, manage, manipulate or access the information (the "**Books and Records**"); and

(xii)   all after-acquired title to or remainder or reversion in any of the property described in this Section; all proceeds (excluding, however, sales or other dispositions of Inventory in the ordinary course of the business or operating the Land or the Improvements), replacements, substitutions, products, accessions and increases within any one or more of the following types of collateral: Goods, Equipment, Inventory, Instruments, Investment Property, Chattel Paper, Letter-of-Credit Rights, Documents, Accounts or General Intangibles, all additions, accessions and extensions to, improvements of and substitutions or replacements for any of the Property described in this Section; and all additional lands, estates, interests, rights or other property acquired by Borrower after the date of this Deed of Trust for use in connection with the Land and Improvements, all without the need for any additional mortgage, assignment, pledge or conveyance to Lender but Borrower will execute and deliver to Lender, upon Lender's request, any documents reasonably requested by Lender to further evidence the foregoing.

Section 2.2 Habendum Clause.  The Property is conveyed to Trustee, TO HAVE AND TO HOLD the Property IN TRUST, FOREVER, for the purpose of securing the Note and the Obligations.

Section 2.3 Security Agreement.

(a)     This Deed of Trust is a real property deed of trust and also a "security agreement" and a "financing statement" within the meaning of the Uniform Commercial Code.

CO_DOCS_A #109558 v2                                   3

*Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 7 of 69*
*Order: 1 Comment:*

The Property includes both real and personal property and all of Borrower's other right, title and interest, whether tangible or intangible, in the Property. By executing and delivering this Deed of Trust, Borrower grants to Lender, as security for the Obligations, a security interest in the Property to the full extent that any of the Property may be subject to the Uniform Commercial Code.

(b)       Borrower desires and intends that this Deed of Trust also constitute a Fixture Filing between Borrower as debtor and Lender as secured party, as defined in the Uniform Commercial Code. To this end, Borrower acknowledges that (i) this Deed of Trust covers goods which are or are to become fixtures on the Land; (ii) this financing statement is to be recorded; (iii) Borrower is the record owner of such property; and (iv) products of collateral are also covered. Except as otherwise provided in the Loan Documents, no financing statement in favor of any secured party other than Lender covering the personal property described herein or any portion thereof is on file in any public office. Borrower will not remove or permit the removal of the collateral or any part thereof without the prior written permission of Lender, provided that obsolete and worn-out articles may be removed concurrently with the replacement or renewal thereof with property of at least equal value or usefulness in the operation of the Property. For purposes of the Fixture Filing, Borrower represents, as of the date hereof, that the following information set forth in clauses (i), (v) and (vi), is true and correct:

(i)       The Exact legal name and address of Debtor is:

EJM Kyrene Property LLC
7975 N. Hayden Road, Suite D-363
Scottsdale, Arizona 85258

(ii)      Name and address of Secured Party:

Lend Lease Mortgage Capital, L.P.
700 North Pearl Street, Suite 2400
Dallas, Texas 75201-7424

(iii)     Description of the types (or items) of property covered by this Financing Statement: all of the property described in Section ii-xii of the Section entitled "Encumbered Property" described or referred to herein and included as part of the Property.

(iv)     Description of real estate to which collateral is attached or upon which it is located: Described in Exhibit A.

(v)      Debtor's chief executive office is located in the State or Commonwealth of Nevada, and Debtor's state or commonwealth of organization is the State or Commonwealth of Arizona.

Lender may file this Deed of Trust, or a reproduction thereof, in the real estate records or other appropriate index, as a financing statement for any of the items specified above as part of the Property. Any reproduction of this Deed of Trust or of any other security agreement or financing statement is sufficient as a financing statement.

Section 2.4 Conditions to Grant. This Deed of Trust is made on the express condition that if Borrower pays and performs the Obligations in full in accordance with the Loan Documents, then unless expressly provided otherwise in the Loan Documents, the Loan Documents will be released at Borrower's expense.

Section 2.5 Cross-Collateralization, Cross-Default, and Deed of Trust Modification Agreement.Contemporaneously with this Deed of Trust, Borrower and affiliates of Borrower have executed and will record that certain Cross-Collateralization, Cross-Default and Deed of Trust Modification Agreement in favor of Lender ("**Cross-Collateralization Agreement**") cross-collateralizing and cross-defaulting the Loan and the Loan Documents with three additional separate loans by Lender to affiliates of Borrower in accordance with the terms of such Cross-Collateralization Agreement. The Cross-Collateralization Agreement will remain in effect until released by its terms.

## ARTICLE III

### OBLIGATIONS SECURED

Section 3.1 The Obligations. This Deed of Trust secures the Principal, the Interest, the Late Charges, the Prepayment Premiums, the Expenses, any additional advances made by Lender in connection with the Property or the Loan and all other amounts payable under the Loan Documents (the "**Debt**") and also secures both the timely payment of the Debt as and when required and the timely performance of all other obligations and covenants to be performed under the Loan Documents (the "**Obligations**").

## ARTICLE IV

### TITLE AND AUTHORITY

Section 4.1 Title to the Property.

(a)     Subject to the conveyance effectuated by this Deed of Trust, Borrower has and will continue to have good and marketable title in fee simple absolute to the Land and the Improvements and good and marketable title to the Fixtures and Personal Property, all free and clear of liens, encumbrances and charges except the Permitted Exceptions. To Borrower's knowledge, there are no facts or circumstances that might give rise to a lien, encumbrance or charge on the Property.

(b)     Borrower owns and will continue to own all of the other Property free and clear of all liens, encumbrances and charges except the Permitted Exceptions.

(c)     This Deed of Trust is and will remain a valid and enforceable first lien on and security interest in the Property, subject only to the Permitted Exceptions.

*Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 9 of 69*
*Order: 1 Comment:*

Section 4.2 <u>Authority</u>.

(a)   Borrower is and will continue to be (i) duly organized, validly existing and in good standing under the Laws of the state or commonwealth in which it was formed, organized or incorporated as set forth in Section 2.3 and (ii) duly qualified to conduct business, in good standing, in the state or commonwealth where the Property is located.

(b)   Borrower has and will continue to have all approvals required by Law or otherwise and full right, power and authority to (i) own and operate the Property and carry on Borrower's business as now conducted or as proposed to be conducted; (ii) execute and deliver the Loan Documents; (iii) grant, mortgage, warrant the title to, convey, assign and pledge the Property to Lender pursuant to the provisions of this Deed of Trust; and (iv) perform the Obligations.

(c)   The execution and delivery of the Loan Documents and the performance of the Obligations do not and will not conflict with or result in a default under any Laws or any Leases or Property Documents and do not and will not conflict with or result in a default under any agreement binding upon any party to the Loan Documents.

(d)   The Loan Documents constitute and will continue to constitute legal, valid and binding obligations of all parties to the Loan Documents enforceable in accordance with their respective terms.

(e)   Borrower has not changed its legal name or its state or commonwealth of organization, as set forth in Section 2.3, in the four months prior to the date hereof, except as Borrower has disclosed any such change to Lender in writing and delivered to Lender appropriate Uniform Commercial Code search reports in connection therewith.

(f)   Borrower has not (i) merged with or into any other entity or otherwise been involved in any reorganization or (ii) acquired substantially all of the assets of any other entity where Borrower became subject to the obligations of such entity, for a period of one year ending on the date hereof, except as Borrower has disclosed any such change, merger, reorganization or acquisition to Lender in writing and delivered to Lender appropriate Uniform Commercial Code search reports in connection therewith.

Section 4.3 <u>No Foreign Person</u>.  Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code.

Section 4.4 <u>Litigation</u>.   There are no Proceedings or, to Borrower's knowledge, investigations against or affecting Borrower or the Property and, to Borrower's knowledge, there are no facts or circumstances that might give rise to a Proceeding or an investigation against or affecting Borrower or the Property.   Borrower will give Lender prompt notice of the commencement of any Proceeding or investigation against or affecting the Property or Borrower which could have a material adverse effect on the Property or on Lender's interests in the Property or under the Loan Documents.  Borrower also will deliver to Lender such additional information relating to the Proceeding or investigation as Lender may request from time to time.

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 10 of 69
Order: 1 Comment:

## ARTICLE V

## PROPERTY STATUS, MAINTENANCE AND LEASES

Section 5.1 Status of the Property.

(a)     Borrower has obtained and will maintain in full force and effect all certificates, licenses, permits and approvals that are issued or required by Law or by any entity having jurisdiction over the Property or over Borrower or that are necessary for the Permitted Use, for occupancy and operation of the Property for the conveyance described in this Deed of Trust and for the conduct of Borrower's business on the Property in accordance with the Permitted Use.

(b)     The Property is and will continue to be serviced by all public utilities required for the Permitted Use of the Property.

(c)     All roads and streets necessary for service of and access to the Property for the current or contemplated use of the Property have been completed and are and will continue to be serviceable, physically open and dedicated to and accepted by the Government for use by the public.

(d)     The Property is free from damage caused by a Casualty.

(e)     All costs and expenses of labor, materials, supplies and equipment used in the construction of the Improvements have been paid in full.

Section 5.2 Maintenance of the Property.  Borrower will maintain the Property in thorough repair and good and safe condition, suitable for the Permitted Use, including, to the extent necessary, replacing the Fixtures and Personal Property with property at least equal in quality and condition to that being replaced and free of liens.  Borrower will not erect any new buildings, building additions or other structures on the Land or otherwise materially alter the Improvements without Lender's prior consent which may be withheld in Lender's sole discretion. The Property will be managed by a property manager satisfactory to Lender pursuant to a management agreement satisfactory to Lender and terminable by Borrower upon 30 days notice to the property manager.

Section 5.3 Change in Use.  Borrower will use and permit the use of the Property for the Permitted Use and for no other purpose.

Section 5.4 Waste.  Borrower will not commit or permit any waste (including economic and non-physical waste), impairment or deterioration of the Property or any alteration, demolition or removal of any of the Property without Lender's prior consent which may be withheld in Lender's sole discretion.

Section 5.5 Inspection of the Property.  Subject to the rights of tenants under the Leases, Lender has the right to enter and inspect the Property on reasonable prior notice, except during the existence of an Event of Default, when no prior notice is necessary. Lender has the right to engage an independent expert to review and report on Borrower's compliance with Borrower's

CO_DOCS_A #109558 v2

7

obligations under this Deed of Trust to maintain the Property, comply with Law and refrain from waste, impairment or deterioration of the Property and the alteration, demolition or removal of any of the Property except as may be permitted by the provisions of this Deed of Trust. If the independent expert's report discloses material failure to comply with such obligations or if Lender engages the independent expert after the occurrence of an Event of Default, then the independent expert's review and report will be at Borrower's expense, payable on demand.

Section 5.6 Leases and Rents.

(a)     Borrower assigns the Leases and the Rents to Lender absolutely and unconditionally and not merely as additional collateral or security for the payment and performance of the Obligations, but subject to a license back to Borrower of the right to collect the Rents unless and until an Event of Default occurs at which time the license will terminate automatically, all as more particularly set forth in the Assignment, the provisions of which are incorporated in this Deed of Trust by reference.

(b)     Borrower appoints Lender as Borrower's attorney-in-fact to execute unilaterally and record, at Lender's election, a document subordinating this Deed of Trust to the Leases, provided that the subordination will not affect (i) the priority of Lender's entitlement to Insurance Proceeds or Condemnation Awards or (ii) the priority of this Deed of Trust over intervening liens or liens arising under or with respect to the Leases.

(c)     Borrower has delivered to Lender an original irrevocable, unconditional letter of credit in the amount of $62,500.00 in a form satisfactory to Lender (the "Rollover Letter of Credit"), stating that it is a clear sight draft issued in favor of Lender by a major U.S. bank acceptable to Lender and payable through a New York City bank, and unconditionally available to Lender by Lender's draft(s) at sight, or by facsimile transmission of sight draft(s) and delivery to the bank on the next business day of the original Rollover Letter of Credit and sight draft(s). The Rollover Letter of Credit will expire not less than annually and Borrower will replace or renew, as applicable, the Rollover Letter of Credit no less than sixty (60) days prior to the expiry date thereof and deliver the original replacement or renewal Rollover Letter of Credit to Lender no less than sixty (60) days prior to the expiration date thereof. The Rollover Letter of Credit will be available through the date which is ninety (90) days after the Maturity Date. Lender may draw on the Rollover Letter of Credit (i) in the event Borrower fails to renew the Rollover Letter of Credit as required by this subsection, (ii) upon the occurrence of an Event of Default, or (iii) as Lender deems necessary in its reasonable discretion. Lender will hold the Rollover Letter of Credit as additional security for the Obligations until applied in accordance with the provisions of this Mortgage. If Lender assigns this Mortgage, Borrower will deliver to or at the direction of the assignee such amendments or replacements of the Rollover Letter of Credit as may be required. Lender will be released from any and all liability with respect to a draw under the Rollover Letter of Credit and Borrower will look solely to the assignee with respect to the Rollover Letter of Credit. Upon payment in full of the Debt on the Maturity Date or in connection with a permitted prepayment in full, the Rollover Letter of Credit or any unapplied balance thereof will be returned to Borrower.

Section 5.7 Parking. Borrower will provide, maintain, police and light parking areas within the Property, including any sidewalks, aisles, streets, driveways, sidewalk cuts and rights-

of-way to and from the adjacent public streets, in a manner consistent with the Permitted Use and sufficient to accommodate the greatest of: (i) the number of parking spaces required by Law; or (ii) the number of parking spaces required by the Leases and the Property Documents. The parking areas will be reserved and used exclusively for ingress, egress and parking for Borrower and the tenants under the Leases and their respective employees, customers and invitees and in accordance with the Leases and the Property Documents.

Section 5.8 <u>Separate Tax Lot</u>. The Property is and will remain assessed for real estate tax purposes as one or more wholly independent tax lots, separate from any property that is not part of the Property.

Section 5.9 <u>Changes in Zoning or Restrictive Covenants</u>. Borrower will not (i) initiate, join in or consent to any change in any Laws pertaining to zoning, any restrictive covenant or other restriction which would restrict the Permitted Uses for the Property; (ii) permit the Property to be used to fulfill any requirements of Law for the construction or maintenance of any improvements on property that is not part of the Property; (iii) permit the Property to be used for any purpose not included in the Permitted Use; or (iv) impair the integrity of the Property as a single, legally subdivided zoning lot separate from all other property.

Section 5.10 <u>Lender's Right to Appear</u>. Lender has the right to appear in and defend any Proceeding brought regarding the Property and to bring any Proceeding, in the name and on behalf of Borrower or in Lender's name, which Lender, in its sole discretion, determines should be brought to protect Lender's interest in the Property.

Section 5.11 <u>Communities Facilities District</u>. Without obtaining the prior written consent of Lender, Borrower shall not consent to, or vote in favor of, the inclusion of all or any part of the Property in any Community Facilities District formed pursuant to the Community Facilities District Act, A.R.S. Section 48-701, et seq., as amended from time to time. Borrower shall immediately give notice to Lender of any notification or advice that Borrower may receive from any municipality or other third party of any intent or proposal to include all or any part of the Property in a Community Facilities District. Lender shall have the right to file a written objection to the inclusion of all or any part of the Property in a Community Facilities District, either in its own name or in the name of Borrower, and to appear at, and participate in, any hearing with respect to the formation of any such district.

**ARTICLE VI**

**IMPOSITIONS AND ACCUMULATIONS**

Section 6.1 <u>Impositions</u>.

(a)     Except as paid through the Accumulations Depositary, Borrower will pay each Imposition at least 15 days before the date (the "**Imposition Penalty Date**") that is the earlier of (i) the date on which the Imposition becomes delinquent and (ii) the date on which any penalty, interest or charge for non-payment of the Imposition accrues.

(b)     At least 10 days before each Imposition Penalty Date, Borrower will deliver to Lender a receipted bill or other evidence of payment.

CO_DOCS_A #109558 v2                                    9

(c)     Borrower, at its own expense, may contest any Taxes or Assessments, provided that the following conditions are met:

(i)     not less than 30 days prior to the Imposition Penalty Date, Borrower delivers to Lender notice of the proposed contest;

(ii)    the contest is by a Proceeding promptly initiated and conducted diligently and in good faith;

(iii)   there is no Event of Default;

(iv)    the Proceeding suspends the collection of the contested Taxes or Assessments;

(v)     the Proceeding is permitted under and is conducted in accordance with the Leases and the Property Documents;

(vi)    the Proceeding precludes imposition of criminal or civil penalties and sale or forfeiture of the Property and Lender will not be subject to any civil suit; and

(vii)   Borrower either deposits with the Accumulations Depositary reserves or furnishes a bond or other security satisfactory to Lender, in either case in an amount sufficient to pay the contested Taxes or Assessments, together with all interest and penalties or Borrower pays all of the contested Taxes or Assessments under protest.

(d)     Installment Payments.  If any Assessment is payable in installments, Borrower will nevertheless pay the Assessment in its entirety on the day the first installment becomes due and payable or a lien, unless Lender, in its sole discretion, approves payment of the Assessment in installments.

Section 6.2  Accumulations.

(a)     Borrower made an initial deposit on account of Taxes and Assessments with either Lender or a mortgage servicer or financial institution designated or approved by Lender from time to time, acting on behalf of Lender as Lender's agent or otherwise such that Lender is the "customer", as defined in the Uniform Commercial Code of the depository bank with respect to the deposit account into which the Accumulations are deposited, to receive, hold and disburse the Accumulations in accordance with this Section and the Section entitled "General Provisions - Accumulations and Reserves" (the "Accumulations Depositary").  On the tenth day of each calendar month during the Term Borrower will deposit with the Accumulations Depositary an amount equal to one-twelfth $(1/12^{th})$ of the annual Taxes and Assessments as determined by Lender or its designee.  At least 45 days before each Imposition Penalty Date, Borrower will deliver to the Accumulations Depositary any bills and other documents that are necessary to pay the Taxes and Assessments.

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 14 of 69
Order: 1 Comment:

(b)     Borrower has not made an initial deposit on account of Insurance Premiums with either Lender or the Accumulations Depositary.  However, upon the occurrence of an Insurance Premiums Deposit Event (as defined below), Borrower will be required to commence making monthly deposits with the Accumulations Depositary on account of Insurance Premiums as follows: (i) on the tenth day of the first calendar month following the occurrence of the Insurance Premiums Deposit Event, Borrower will deposit with the Accumulations Depositary an amount, to be determined by Lender, which, when added to the monthly deposits of Insurance Premiums to be made prior to the date the next payment of Insurance Premiums is due, will be sufficient to pay such Insurance Premiums, and (ii) on the tenth day of each calendar month thereafter, Borrower will deposit with the Accumulations Depositary an amount equal to one-twelfth (1/12th) of the annual Insurance Premiums as determined by Lender or its designee. Thereafter, if Lender determines that the amount of Borrower's monthly deposit on account of Insurance Premiums must increase or decrease, Lender will notify Borrower and the Accumulations Depositary in writing of the new monthly deposit amount.  Commencing on the tenth day of the month next succeeding such written notification, Borrower will deposit with the Accumulations Depositary an amount equal to the new monthly amount set forth in Lender's written notice.  If Borrower receives notification from any Insurer of a change in the amount of the Insurance Premiums, Borrower will immediately notify Lender thereof in writing.  An "**Insurance Premiums Deposit Event**" means the occurrence of any one or more of the following: (i) a default under this Deed of Trust or any other Loan Document, or (ii) if any entity other than Borrower has fee title to the Property.

(c)     The Accumulations will be applied to the payment of Taxes and Assessments and, if applicable, Insurance Premiums.  Any excess Accumulations after payment of Taxes and Assessments and Insurance Premiums will be returned to Borrower or credited against future payments of the Accumulations, at Lender's election or as required by Law.  If the Accumulations are not sufficient to pay Taxes and Assessments or Insurance Premiums, Borrower will pay the deficiency to the Accumulations Depositary within 5 days of demand.

(d)     Lender has the right to pay, or to direct the Accumulations Depositary to pay, any Taxes or Assessments unless Borrower is contesting the Taxes or Assessments in accordance with the provisions of this Deed of Trust, in which event any payment of the contested Taxes or Assessments will be made under protest in the manner prescribed by Law or, at Lender's election, will be withheld.

Section 6.3  Changes in Tax Laws.  If a Law requires the deduction of the Debt from the value of the Property for the purpose of taxation or imposes a tax, either directly or indirectly, on the Debt, any Loan Document or Lender's interest in the Property, Borrower will pay the tax with interest and penalties, if any.  If Lender determines that Borrower's payment of the tax may be unlawful, unenforceable, usurious or taxable to Lender, the Debt will become immediately due and payable on 60 days' prior notice unless the tax must be paid within the 60-day period, in which case, the Debt will be due and payable within the lesser period.

Section 6.4  Capital Expenditures Reserves.

(a)     Borrower has not made an initial deposit on account of capital expenditures with either Lender or a mortgage servicer or financial institution designated or

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 15 of 69
Order: 1 Comment:

approved by Lender from time to time, acting on behalf of Lender as Lender's agent or otherwise such that Lender is the "customer", as defined in the Uniform Commercial Code of the depository bank with respect to the deposit account into which the Capital Expenditures Reserves are deposited, to receive, hold and disburse the Capital Expenditures Reserves in accordance with this Section and the Section entitled "**General Provisions - Accumulations and Reserves**" (the "**Capital Expenditures Depositary**").  However, upon the occurrence of a Capital Expenditures Deposit Event (as defined below), Borrower will be required to commence making monthly deposits with the Capital Expenditures Depositary on account of capital expenditures as follows: (i) on the tenth day of the first calendar month following the occurrence of the Capital Expenditures Deposit Event, Borrower will deposit with the Capital Expenditures Depositary an amount equal to one-twelfth (1/12th) of the annual capital expenditures as determined by Lender or its designee.  Thereafter, if Lender determines that the amount of Borrower's monthly deposit on account of capital expenditures must increase or decrease, Lender will notify Borrower and the Capital Expenditures Depositary in writing of the new monthly deposit amount.  Commencing on the tenth day of the month next succeeding such written notification, Borrower will deposit with the Capital Expenditures Depositary an amount equal to the new monthly amount set forth in Lender's written notice.  If Borrower becomes aware of a change in the amount of the anticipated annual capital expenditures, Borrower will immediately notify Lender thereof in writing.  A "**Capital Expenditures Deposit Event**" means the occurrence of any one or more of the following: (i) default under this Deed of Trust or any other Loan Document or (ii) if any entity other than Borrower has fee title to the Property.

(b)     Provided there is no Event of Default or default or event which, with the passage of time or the giving of notice would constitute an Event of Default, Lender will, to the extent funds are available in account established for Capital Expenditures Reserves (the "**Capital Expenditures Reserve Account**"), authorize the Capital Expenditures Depositary to disburse to Borrower the amount paid by Borrower for capital expenditures approved by Lender within 10 Business Days following:

(i)     the receipt by Lender of a written request from Borrower for disbursement from the Capital Expenditures Reserve Account;

(ii)    the delivery to Lender of invoices, receipts or other evidence satisfactory to Lender, verifying the cost of the items of work performed;

(iii)   the delivery to Lender of affidavits, lien waivers or other evidence reasonably satisfactory to Lender showing that all parties who might or could claim statutory or common law liens and are furnishing or have furnished material or labor to the Property have been paid all amounts due for labor and materials furnished to the Property; and

(iv)    where applicable in light of the nature of the work for which the capital expenditure was made, an architect's certificate of completion and/or an unconditional certificate of the appropriate

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 16 of 69
Order: 1 Comment:

governmental authorities evidencing compliance with all building and other applicable regulations.

Lender will not be required to authorize advances from the Capital Expenditures Reserve Account more frequently than once in any thirty (30) day period or in amounts less than $10,000 in any single advance. In authorizing the Capital Expenditures Depositary to make any payment from the Capital Expenditures Reserve Account, Lender will be entitled to rely on such request from Borrower without any inquiry into the accuracy, validity or contestability of any such amount.

Section 6.5   General Provisions - Accumulations and Reserves.

(a)      The Accumulations Depositary and Capital Expenditures Depositary (collectively the "**Depositary**") will hold the Accumulations and Capital Expenditures Reserves (collectively the "**Deposits**") as additional security for the Obligations until applied in accordance with the provisions of this Deed of Trust and any agreement among Borrower, Lender and the Depository. Depositary will not disburse or otherwise pay any funds from the Deposits other than in accordance with this Article. If Lender is not the Depositary, the Depositary will deliver the Deposits to Lender upon Lender's demand at any time after an Event of Default and Lender may apply the Deposits as a credit against any portion of the Debt selected by Lender in its sole discretion.

(b)      Depositary will at all times during the Term keep and maintain accurate, complete and current books and records with respect to the Deposits and will make available to Lender (if Depositary is not Lender) and to Borrower, in electronic format or otherwise, information as to the balance of Accumulations and Capital Expenditures Reserves.

(c)      If the Property is sold or conveyed other than by foreclosure or transfer in lieu of foreclosure, all right, title and interest of Borrower to the Deposits will automatically, and without necessity of further assignment, be held for the account of the new owner, subject to the provisions of this Section and Borrower will have no further interest in the Deposits.

(d)      Borrower waives all right to demand, receive or collect any interest or other return on the Deposits which may be held in a non-interest bearing account (except as required by Law) and may be commingled with other monies held by the Depositary and will not be held in trust.

(e)      If Lender assigns this Deed of Trust, Lender will pay, or cause the Depositary to pay, the unapplied balance of the Deposits to or at the direction of the assignee. Simultaneously with the payment, Lender and the Depositary will be released from all liability with respect to the Deposits and Borrower will look solely to the assignee with respect to the Deposits. When the Obligations have been fully satisfied, any unapplied balance of the Deposits will be returned to Borrower.

(f)      Borrower will pay all reasonable and customary service fees of Depositary at the rate charged by Depositary for such services in connection with similar loans serviced by Depositary for Lender as noteholder or bondholder, and such reasonable attorneys' fees, out-of-pocket expenses and other costs as may be incurred by Depositary in connection with the

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 17 of 69
Order: 1 Comment:

administration of the Deposits. Said fees, attorneys' fees, out-of-pocket expenses and other costs are included in the definition of Expenses.

(g)     Borrower hereby agrees to indemnify, protect, save and hold harmless Depositary, its successors and assigns and agents pursuant to this Deed of Trust, from any and all liabilities, obligations, losses, damages, claims, actions, suits, costs or expenses (including, without limitation, reasonable attorneys' fees) of whatsoever kind or nature imposed on, incurred by or asserted against Depositary which in any way relate to or arise out of any action taken under this Article; provided, however, that Borrower will have no obligation to indemnify, save and hold harmless Depositary for any liability incurred by, imposed upon or established against Depositary, as the case may be, for its willful misconduct, gross negligence or breach of duties under this Article or for claims of Lender against Depositary.

## ARTICLE VII

## INSURANCE, CASUALTY, CONDEMNATION AND RESTORATION

Section 7.1  Insurance Coverages.

(a)     Borrower will maintain such insurance coverages and endorsements in form and substance and in amounts as Lender may require in its sole discretion, from time to time.  Until Lender notifies Borrower of changes in Lender's requirements, Borrower will maintain not less than the insurance coverages and endorsements Lender required for closing of the Loan.

(b)     The insurance, including renewals, required under this Section will be issued on valid and enforceable policies and endorsements satisfactory to Lender (the "**Policies**").  Each Policy will contain a standard waiver of subrogation and a replacement cost endorsement and will provide that Lender will receive not less than 30 days' prior written notice of any cancellation, termination or non-renewal of a Policy or any material change other than an increase in coverage and that Lender will be named under a standard mortgage endorsement as loss payee.

(c)     The insurance companies issuing the Policies (the "**Insurers**") must be authorized to do business in the State or Commonwealth where the Property is located, must have been in business for at least 5 years, must carry an A.M. Best Company, Inc. policy holder rating of A or better and an A.M. Best Company, Inc. financial category rating of Class X or better and must be otherwise satisfactory to Lender.  Lender may select an alternative credit rating agency and may impose different credit rating standards for the Insurers.  Notwithstanding Lender's right to approve the Insurers and to establish credit rating standards for the Insurers, Lender will not be responsible for the solvency of any Insurer.

(d)     Notwithstanding Lender's rights under this Article, Lender will not be liable for any loss, damage or injury resulting from the inadequacy or lack of any insurance coverage.

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 18 of 69
Order: 1 Comment:

(e)     Borrower will comply with the provisions of the Policies and with the requirements, notices and demands imposed by the Insurers and applicable to Borrower or the Property.

(f)     Except as paid through the Accumulations Depositary, Borrower will pay the Insurance Premiums for each Policy not less than 30 days before the expiration date of the Policy being replaced or renewed and will deliver to Lender an original or, if a blanket policy, a certified copy of each Policy marked "Paid" not less than 15 days prior to the expiration date of the Policy being replaced or renewed.  Following the occurrence of an Insurance Premiums Deposit Event, Borrower will deliver to the Accumulations Depository (with a copy to Lender) at least 45 days before the expiration date of any Policy being replaced or renewed, the bill for the Insurance Premiums for the renewal or replacement of such Policy.

(g)     Borrower will not carry separate insurance concurrent in kind or form or contributing in the event of loss with any other insurance carried by Borrower.

(h)     Borrower will not carry any of the insurance required under this Section on a blanket or umbrella policy without in each instance Lender's prior approval which may be withheld in Lender's sole discretion.  If Lender approves, Borrower will deliver to Lender a certified copy of the blanket policy which will allocate to the Property the amount of coverage required under this Section and otherwise will provide the same coverage and protection as would a separate policy insuring only the Property.

(i)     Borrower will give the Insurers prompt notice of any change in ownership or occupancy of the Property.  This subsection does not abrogate the prohibitions on transfers set forth in this Deed of Trust.

(j)     If the Property is sold at a foreclosure sale or otherwise is transferred so as to extinguish the Obligations, all of Borrower's right, title and interest in and to the Policies then in force will be transferred automatically to the purchaser or transferee.

Section 7.2  Casualty and Condemnation.

(a)     Borrower will give Lender notice of any Casualty immediately after it occurs and will give Lender notice of any Condemnation Proceeding immediately after Borrower receives notice of commencement or notice that such a Condemnation Proceeding will be commencing.  Borrower immediately will deliver to Lender copies of all documents Borrower delivers or receives relating to the Casualty or the Condemnation Proceeding, as the case may be.

(b)     Borrower authorizes Lender, at Lender's option, to act on Borrower's behalf to collect, adjust and compromise any claims for loss, damage or destruction under the Policies on such terms as Lender determines in Lender's sole discretion.  Borrower authorizes Lender to act, at Lender's option, on Borrower's behalf in connection with any Condemnation Proceeding.  Borrower will execute and deliver to Lender all documents requested by Lender and all documents as may be required by Law to confirm such authorizations.  Nothing in this Section will be construed to limit or prevent Lender from joining with Borrower either as a co-defendant or as a co-plaintiff in any Condemnation Proceeding.

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 19 of 69
Order: 1 Comment:

(c)     If Lender elects not to act on Borrower's behalf as provided in this Section, then Borrower promptly will file and prosecute all claims (including Lender's claims) relating to the Casualty and will prosecute or defend (including defense of Lender's interest) any Condemnation Proceeding. Borrower will have the authority to settle or compromise the claims or Condemnation Proceeding, as the case may be, provided that Lender has approved in Lender's sole discretion any compromise or settlement that exceeds $250,000.00.   Any check for Insurance Proceeds or Condemnation Awards, as the case may be (the "**Proceeds**") will be made payable to Lender and Borrower. Borrower will endorse the check to Lender immediately upon Lender presenting the check to Borrower for endorsement or if Borrower receives the check first, will endorse the check immediately upon receipt and forward it to Lender.  If any Proceeds are paid to Borrower, Borrower immediately will deposit the Proceeds with Lender, to be applied or disbursed in accordance with the provisions of this Deed of Trust. Lender will be responsible for only the Proceeds actually received by Lender.

Section 7.3 Application of Proceeds.  After deducting the costs incurred by Lender in collecting the Proceeds, Lender may, in its sole discretion, (i) apply the Proceeds as a credit against any portion of the Debt selected by Lender in its sole discretion; (ii) apply the Proceeds to restore the Improvements, provided that Lender will not be obligated to see to the proper application of the Proceeds and provided further that any amounts released for Restoration will not be deemed a payment on the Debt; or (iii) deliver the Proceeds to Borrower.

Section 7.4 Conditions to Availability of Proceeds for Restoration.  Notwithstanding the preceding Section, after a Casualty or a Condemnation ("**Destruction Event**"), Lender will make the Proceeds (less any costs incurred by Lender in collecting the Proceeds) available for Restoration in accordance with the conditions for disbursements set forth in the Section entitled "**Restoration**", provided that the following conditions are met:

(i)     EJM KYRENE PROPERTY LLC or the transferee under a Permitted Transfer, if any, continues to be Borrower at the time of the Destruction Event and at all times thereafter until the Proceeds have been fully disbursed;

(ii)    no default under the Loan Documents exists at the time of the Destruction Event and no Event of Default has occurred during the 12 months prior to the Destruction Event;

(iii)   all Leases in effect immediately prior to the Destruction Event and all Property Documents in effect immediately prior to the Destruction Event that are essential to the use and operation of the Property continue in full force and effect notwithstanding the Destruction Event;

(iv)    if the Destruction Event is a Condemnation, Borrower delivers to Lender evidence satisfactory to Lender that the Improvements can be restored to an economically and architecturally viable unit;

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 20 of 69
Order: 1 Comment:

(v)     Borrower delivers to Lender evidence satisfactory to Lender that the Proceeds are sufficient to complete Restoration or if the Proceeds are insufficient to complete Restoration, Borrower first deposits with Lender funds ("**Additional Funds**") that when added to the Proceeds will be sufficient to complete Restoration;

(vi)    if the Destruction Event is a Casualty, Borrower delivers to Lender evidence satisfactory to Lender that the Insurer under each affected Policy has not denied liability under the Policy as to Borrower or the insured under the Policy;

(vii)   Lender is satisfied that the proceeds of any business interruption insurance in effect together with other available gross revenues from the Property are sufficient to pay Debt Service Payments after paying the Impositions, Insurance Premiums, reasonable and customary operating expenses and capital expenditures until Restoration is complete;

(viii)  Lender is satisfied that Restoration will be completed on or before the date (the "**Restoration Completion Date**") that is the earliest of: (A) 12 months prior to the Maturity Date; (B) 12 months after the Destruction Event; (C) the earliest date required for completion of Restoration under any Lease or any Property Document; or (D) any date required by Law; and

(ix)    the annual Rents (excluding security deposits) under Leases in effect on the date of the Destruction Event are providing debt service coverage for the annual Debt Service Payments of 1.20 after payment of annual Insurance Premiums, Impositions and operating expenses of the Property (including ground rent, if any), provided that, if the Rents do not provide such debt service coverage, then Borrower expressly authorizes and directs Lender to apply an amount from the Proceeds to reduction of Principal in order to reduce the annual Debt Service Payments sufficiently for such debt service coverage to be achieved. The reduced Debt Service Payments will be calculated using the Fixed Interest Rate and an amortization schedule that will achieve the same proportionate amortization of the reduced Principal over the then remaining Term as would have been achieved if the Principal and the originally scheduled Debt Service Payments had not been reduced. Borrower will execute any documentation that Lender deems reasonably necessary to evidence the reduced Principal and Debt Service Payments.

CO_DOCS_A #109558 v2                          17

Section 7.5 <u>Restoration</u>.

(a)     If the total Proceeds for any Destruction Event are $150,000.00 or less and Lender elects or is obligated by Law or under this Article to make the Proceeds available for Restoration, Lender will disburse to Borrower the entire amount received by Lender and Borrower will commence Restoration promptly after the Destruction Event and complete Restoration not later than the Restoration Completion Date.

(b)     If the Proceeds for any Destruction Event exceed $150,000.00 and Lender elects or is obligated by Law or under this Article to make the Proceeds available for Restoration, Lender will disburse the Proceeds and any Additional Funds (the "**Restoration Funds**") upon Borrower's request as Restoration progresses, generally in accordance with normal construction lending practices for disbursing funds for construction costs, <u>provided</u> that the following conditions are met:

(i)     Borrower commences Restoration promptly after the Destruction Event and completes Restoration on or before the Restoration Completion Date;

(ii)     if Lender requests, Borrower delivers to Lender prior to commencing Restoration, for Lender's approval, plans and specifications and a detailed budget for the Restoration;

(iii)     Borrower delivers to Lender satisfactory evidence of the costs of Restoration incurred prior to the date of the request, and such other documents as Lender may request including mechanics' lien waivers and title insurance endorsements;

(iv)     Borrower pays all costs of Restoration whether or not the Restoration Funds are sufficient and, if at any time during Restoration, Lender determines that the undisbursed balance of the Restoration Funds is insufficient to complete Restoration, Borrower deposits with Lender, as part of the Restoration Funds, an amount equal to the deficiency within 30 days of receiving notice of the deficiency from Lender; and

(v)     there is no default under the Loan Documents at the time Borrower requests funds or at the time Lender disburses funds.

(c)     If an Event of Default (or event or default which, with the passage of time or the giving of notice, would constitute an Event of Default) occurs at any time after the Destruction Event, then Lender will have no further obligation to make any remaining Proceeds available for Restoration and may apply any remaining Proceeds as a credit against any portion of the Debt selected by Lender in its sole discretion.

(d)     Lender may elect at any time prior to commencement of Restoration or while work is in progress to retain, at Borrower's expense, an independent engineer or other consultant to review the plans and specifications, to inspect the work as it progresses and to

CO_DOCS_A #109558 v2                          18

provide reports. If any matter included in a report by the engineer or consultant is unsatisfactory to Lender, Lender may suspend disbursement of the Restoration Funds until the unsatisfactory matters contained in the report are resolved to Lender's satisfaction.

(e)     If Borrower fails to commence and complete Restoration in accordance with the terms of this Article, then in addition to the Remedies, Lender may elect to restore the Improvements on Borrower's behalf and reimburse itself out of the Restoration Funds for costs and expenses incurred by Lender in restoring the Improvements, or Lender may apply the Restoration Funds as a credit against any portion of the Debt selected by Lender in its sole discretion.

(f)     Lender may commingle the Restoration Funds with its general assets and will not be liable to pay any interest or other return on the Restoration Funds unless otherwise required by Law. Lender will not hold any Restoration Funds in trust. Lender may elect to deposit the Restoration Funds with a depositary satisfactory to Lender under a disbursement and security agreement satisfactory to Lender.

(g)     Borrower will pay all of Lender's expenses incurred in connection with a Destruction Event or Restoration. If Borrower fails to do so, then in addition to the Remedies, Lender may from time to time reimburse itself out of the Restoration Funds.

(h)     If any excess Proceeds remains after Restoration, Lender may elect, in its sole discretion either to apply the excess as a credit against any portion of the Debt as selected by Lender in its sole discretion or to deliver the excess to Borrower.

## ARTICLE VIII
## COMPLIANCE WITH LAW AND AGREEMENTS

Section 8.1 Compliance with Law. Borrower, the Property and the use of the Property comply and will continue to comply with Law and with all agreements and conditions necessary to preserve and extend all rights, licenses, permits, privileges, franchises and concessions (including zoning variances, special exceptions and non-conforming uses) relating to the Property or Borrower. Borrower will notify Lender of the commencement of any investigation or Proceeding relating to a possible violation of Law immediately after Borrower receives notice thereof and, will deliver promptly to Lender copies of all documents Borrower receives or delivers in connection with the investigation or Proceeding. Borrower will not alter the Property in any manner that would increase Borrower's responsibilities for compliance with Law.

Section 8.2 Compliance with Agreements. There are no defaults, events of defaults or events which, with the passage of time or the giving of notice, would constitute an event of default under the Property Documents. Borrower will pay and perform all of its obligations under the Property Documents as and when required by the Property Documents. Borrower will cause all other parties to the Property Documents to pay and perform their obligations under the Property Documents as and when required by the Property Documents. Borrower will not amend or waive any provisions of the Property Documents; exercise any options under the Property Documents; give any approval required or permitted under the Property Documents that would adversely affect the Property or Lender's rights and interests under the Loan Documents;

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 23 of 69
Order: 1 Comment:

cancel or surrender any of the Property Documents; or release or discharge or permit the release or discharge of any party to or entity bound by any of the Property Documents, without, in each instance, Lender's prior approval (excepting therefrom all service contracts or other agreements entered into in the normal course of business that are cancelable upon not more than 30 days notice). Borrower promptly will deliver to Lender copies of any notices of default or of termination that Borrower receives or delivers relating to any Property Document.

Section 8.3 <u>ERISA Compliance</u>.

(a)       Borrower and each of Borrower's constituent entities is not and will continue not to be an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974 ("<u>ERISA</u>") that is subject to Title I of ERISA or a "plan" as defined in Section 4975(e)(1) of the Code that is subject to Section 4975 of the Code, and neither the assets of Borrower or of Borrower's constituent entities are or will constitute "plan assets" of one or more such plans for purposes of Title I of ERISA or Section 4975 of the Code.

(b)       Borrower is not and will continue not to be a "<u>governmental plan</u>" within the meaning of Section 3(32) of ERISA, and transactions by or with Borrower are not and will not be subject to any Laws regulating investments of and fiduciary obligations with respect to governmental plans.

(c)       Borrower will not engage in any transaction which would cause any obligation or any action under the Loan Documents, including Lender's exercise of the Remedies, to be a non-exempt prohibited transaction under ERISA.

Section 8.4 <u>Section 6045(e) Filing</u>.  Borrower will supply or cause to be supplied to Lender either (i) a copy of a completed Form 1099-B, Statement for Recipients of Proceeds from Real Estate, Broker and Barter Exchange Proceeds prepared by Borrower's attorney or other person responsible for the preparation of the form, together with a certificate from the person who prepared the form to the effect that the form has, to the best of the preparer's knowledge, been accurately prepared and that the preparer will timely file the form; or (ii) a certification from Borrower that the Loan is a refinancing of the Property or is otherwise not required to be reported to the Internal Revenue Service pursuant to Section 6045(e) of the Code. Under no circumstances will Lender or Lender's counsel be obligated to file the reports or returns.

Section 8.5 <u>Compliance with Anti-Terrorism Laws</u>.

(a)       None of Borrower, Guarantor, Indemnitor or their respective constituents or affiliates are or will be in violation of any Anti-Terrorism Law.

(b)       None of Borrower, Guarantor, Indemnitor, any of their respective constituents or affiliates, any of their respective brokers or other agents acting or benefiting in any capacity in connection with the Loan or, to Borrower's knowledge as of the date hereof, the Seller of the Property (if any portion of the Property is being acquired with proceeds of the Loan) is or will be a Prohibited Person.

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 24 of 69
Order: 1 Comment:

(c)     None of Borrower, Guarantor, Indemnitor, any of their respective affiliates or constituents, any of their respective brokers or other agents acting in any capacity in connection with the Loan or to Borrower's knowledge as of the date hereof the seller of the Property (if any portion of the Property is being acquired with proceeds of the Loan), is or will (i) conduct any business or engage in any transaction or dealing with any Prohibited Person, including the making or receiving any contribution of funds, goods or services to or for the benefit of any Prohibited Person, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224; or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(d)     Borrower covenants and agrees to deliver to Lender any certification or other evidence requested from time to time by Lender in its sole discretion, confirming Borrower's compliance with this Section.

## ARTICLE IX

## ENVIRONMENTAL

Section 9.1  Environmental Representations and Warranties.

Except as disclosed in the Environmental Report and to Borrower's knowledge as of the date of this Deed of Trust:

(i)     no Environmental Activity has occurred or is occurring on the Property other than the use, storage, and disposal of Hazardous Substances which (A) is in the ordinary course of business consistent with the Permitted Use; (B) is in compliance with all Environmental Laws and (C) has not resulted in Material Environmental Contamination of the Property; and

(ii)    no Environmental Activity has occurred or is occurring on any property in the vicinity of the Property which has resulted in Material Environmental Contamination of the Property.

Section 9.2  Environmental Covenants.

(a)     Borrower will not cause or permit any Material Environmental Contamination of the Property.

(b)     No Environmental Activity will occur on the Property other than the use, storage and disposal of Hazardous Substances which (A) is in the ordinary course of business consistent with the Permitted Use; (B) is in compliance with all Environmental Laws; and (C) does not create a risk of Material Environmental Contamination of the Property.

(c)     Borrower will notify Lender immediately upon Borrower becoming aware of (i) any Material Environmental Contamination of the Property or (ii) any Environmental

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 25 of 69
Order: 1 Comment:

Activity with respect to the Property that is not in accordance with the preceding subsection (b). Borrower promptly will deliver to Lender copies of all documents delivered to or received by Borrower regarding the matters set forth in this subsection, including notices of Proceedings or investigations concerning any Material Environmental Contamination of the Property or Environmental Activity or concerning Borrower's status as a potentially responsible party (as defined in the Environmental Laws). Borrower's notification of Lender in accordance with the provisions of this subsection will not be deemed to excuse any default under the Loan Documents resulting from the violation of Environmental Laws or the Material Environmental Contamination of the Property or Environmental Activity that is the subject of the notice. If Borrower receives notice of a suspected violation of Environmental Laws in the vicinity of the Property that poses a risk of Material Environmental Contamination of the Property, Borrower will give Lender notice and copies of any documents received relating to such suspected violation.

(d)     From time to time at Lender's request, Borrower will deliver to Lender any information known and documents available to Borrower relating to the environmental condition of the Property.

(e)     Lender may perform or engage an independent consultant to perform an assessment of the environmental condition of the Property and of Borrower's compliance with this Section on an annual basis or at any time for reasonable cause or after an Event of Default. In connection with the assessment: (i) Lender or consultant may enter and inspect the Property and perform tests of the air, soil, ground water and building materials; (ii) Borrower will cooperate and use best efforts to cause tenants and other occupants of the Property to cooperate with Lender or consultant; (iii) Borrower will receive a copy of any final report prepared after the assessment, to be delivered to Borrower not more than 10 days after Borrower requests a copy and executes Lender's standard confidentiality and waiver of liability letter; (iv) Borrower will accept custody of and arrange for lawful disposal of any Hazardous Substances required to be disposed of as a result of the tests; (v) Lender will not have liability to Borrower with respect to the results of the assessment; and (vi) Lender will not be responsible for any damage to the Property resulting from the tests described in this subsection and Borrower will look solely to the consultants to reimburse Borrower for any such damage. The consultant's assessment and reports will be at Borrower's expense (i) if the reports disclose any material adverse change in the environmental condition of the Property from that disclosed in the Environmental Report; (ii) if Lender engaged the consultant when Lender had reasonable cause to believe Borrower was not in compliance with the terms of this Article and, after written notice from Lender, Borrower failed to provide promptly reasonable evidence that Borrower is in compliance; or (iii) if Lender engaged the consultant or after the occurrence of an Event of Default.

(f)     If Lender has reasonable cause to believe that there is Environmental Activity at the Property, Lender may elect in its sole discretion to direct the Trustee to reconvey any portion of the Property affected by the Environmental Activity to Borrower, and Borrower will accept such reconveyance.

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 26 of 69
Order: 1 Comment:

# ARTICLE X

# FINANCIAL REPORTING

Section 10.1 Financial Reporting.

(a)     Borrower will deliver to Lender within 90 days after the close of each Fiscal Year (including partial Fiscal Years) an annual financial statement (the "**Annual Financial Statement**") for the Property and, at Lender's request, for Borrower, Guarantor, and Indemnitor, for such Fiscal Year, which will include a comparative balance sheet, a cash flow statement, an income and expense statement, a detailed breakdown of all receipts and expenses and all supporting schedules.  In addition to the foregoing, Borrower will deliver to Lender, on the last day of each month following closing and continuing through the earlier to occur of the following, but in no event before June 30, 2003:  (i) a release of the Cross-Collateralization Agreement; or (ii) January 10, 2004, monthly operating statements for the Property for each preceding month.  The Annual Financial Statement will be:

(i)      certified by Borrower and each Guarantor as true and correct;

(ii)     separate and distinct from any consolidated statement or report for Borrower or any other entity or any other property; and

(iii)    prepared on either a cash, modified cash, or federal tax basis applied consistently, including a footnote defining the difference between the basis applied and GAAP basis accounting.

(b)     Borrower will deliver to Lender promptly any other financial information with respect to the operation and management of Borrower and the Property as Lender may reasonably request from time to time, including quarterly unaudited financial statements and capital and operating budgets for the then current fiscal year, a rent roll on a quarterly basis and, upon the occurrence of a Lockbox Event, capital and operating budgets for the next Fiscal Year, and, if Lender sells the Loan or assigns the Loan Documents, other financial information regarding Borrower, Guarantor, the Leases and the Property, such as budgets and rent rolls. Borrower will deliver to Lender, on the tenth day of each month following closing and continuing through January 10, 2004, monthly certified rent rolls for the Property for each preceding month.

Section 10.2.  Certificate of Good Standing.  Borrower will cause to be delivered to Lender, together with the annual financial statement required to be delivered hereunder, or as otherwise requested by Lender from time to time, a certificate of good standing from its state or commonwealth of organization.

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 27 of 69
Order: 1 Comment:

## ARTICLE XI

### EXPENSES AND DUTY TO DEFEND

Section 11.1 Payment of Expenses.

(a)    Borrower is obligated to pay all fees and expenses (the "**Expenses**") incurred by Lender, Trustee or that are otherwise payable in connection with the Loan, the Property or Borrower, including attorneys' fees and expenses and any fees and expenses relating to (i) the preparation, execution, acknowledgment, delivery and recording or filing of the Loan Documents; (ii) any Proceeding or other claim asserted against Lender; (iii) any inspection, assessment, survey and test permitted under the Loan Documents; (iv) any Destruction Event; (v) the preservation of Trustee's title, Lender's security and the exercise of any rights or remedies available at Law, in equity or otherwise; and (vi) the Leases and the Property Documents.

(b)    Borrower will pay the Expenses immediately on demand, together with any applicable interest, premiums or penalties.  If Lender pays any of the Expenses, Borrower will reimburse Lender the amount paid by Lender immediately upon demand, together with interest on such amount at the Default Interest Rate from the date Lender paid the Expenses through and including the date Borrower reimburses Lender.  The Expenses together with any applicable interest, premiums or penalties constitute a portion of the Debt secured by this Deed of Trust.

Section 11.2 Duty to Defend.  If Lender or any of its trustees, officers, participants, employees or affiliates is a party in any Proceeding relating to the Property, Borrower or the Loan, Borrower will indemnify and hold harmless the party and will defend the party with attorneys and other professionals retained by Borrower and approved by Lender.  Lender may elect to engage its own attorneys and other professionals, at Borrower's expense, to defend or to assist in the defense of the party.  In all events, case strategy will be determined by Lender if Lender so elects and no Proceeding will be settled without Lender's prior approval which may be withheld in its sole discretion.

### ARTICLE XII

### TRANSFERS, LIENS AND ENCUMBRANCES

Section 12.1 Prohibitions on Transfers, Liens and Encumbrances.

(a)    Borrower acknowledges that in making the Loan, Lender is relying to a material extent on the business expertise and net worth of Borrower and Borrower's general partners, members or principals and on the continuing interest that each of them has, directly or indirectly, in the Property.  Accordingly, except as specifically set forth in this Deed of Trust, Borrower (i) will not, and will not permit its partners, members or principals to, effect a Transfer without Lender's prior approval, which may be withheld in Lender's sole discretion and (ii) will keep the Property free from all liens and encumbrances other than the lien of this Deed of Trust and the Permitted Exceptions.  A "**Transfer**" is defined as any sale, grant, lease (other than bona fide third-party space leases with tenants), conveyance, assignment or other transfer of, or any encumbrance or pledge against, the Property (other than in accordance with The Cross

CO_DOCS_A #109558 v2                                    24

Collateralization Agreement), any interest in the Property, any interest of Borrower's partners, members or principals in the Property, incurrence of trade debt relating to the Property of more than 5% of the Loan, in the aggregate none of which may be outstanding for more than 60 days, or any change in the identity, composition or control of Borrower or Borrower's constituent entities at any level, in each instance whether voluntary or involuntary, direct or indirect, by operation of law or otherwise and including the grant of an option or the execution of an agreement relating to any of the foregoing matters:

     (b)    Borrower represents, warrants and covenants that:

          (i)    Borrower is an Arizona limited liability company whose sole member (the "**Existing Member**"), owning 100% of the membership interests in Borrower, is EJM KYRENE SPE LLC.

          (ii)    Borrower's Existing Member is an Arizona limited liability company whose sole member, owning 100% of the membership interests, is EJM Development Co., a California limited partnership.

Section 12.2  Permitted Transfers.

     (a)    Notwithstanding the prohibitions regarding Transfers, a Permitted Transfer may occur without Lender's prior consent, provided that the following conditions are met:

          (i)    at least 30 days prior to the proposed Permitted Transfer, Borrower delivers to Lender a notice that is sufficiently detailed to enable Lender to determine that the proposed Permitted Transfer complies with the terms of this Section;

          (ii)    there is no default under the Loan Documents either when Lender receives the notice or when the proposed Permitted Transfer occurs;

          (iii)    the proposed Permitted Transfer will not result in a violation of any of the covenants contained in the Section entitled, "**ERISA Compliance**" and Borrower will deliver to Lender such documentation of compliance as Lender requests in its sole discretion;

          (iv)    the transferee (including any constituents and affiliates of the transferee) is not a Prohibited Person and the Permitted Transfer will not result in a violation of any Anti-Terrorism Laws and, prior to the transfer, Borrower provides Lender with a certification to that effect executed by an entity satisfactory to Lender;

          (v)    when Lender receives the notice and when the proposed Permitted Transfer occurs, the transferee has never been an adverse party to

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 29 of 69
Order: 1 Comment:

Lender in any litigation to which Lender was a party; the transferee has never defaulted on a loan from Lender or on any contract or other agreement with Lender; and the transferee has never threatened litigation against Lender (for purposes of this subsection "transferee" includes the transferee's constituent entities at all levels and "Lender" includes Lender's subsidiaries);

(vi)     Borrower pays all of Lender's expenses relating to the Transfer including Lender's attorneys' fees;

(vii)    Lender is satisfied that the Property will continue to be managed by a manager satisfactory to Lender;

(viii)   When Lender receives notice and when the proposed Permitted Transfer occurs, the transferee is free from bankruptcy;

(ix)     On the date of the proposed Permitted Transfer, if so requested by Lender, a Uniform Commercial Code search report is delivered to Lender relating to (i) the transferee, (ii) any predecessor entity that transferee merged with or into, and (iii) any entity where transferee acquired substantially all of its assets, in each case satisfactory to Lender and indicating that Lender's security interest in such portion of the Property as is perfected by filing a financing statement is prior to all other security interests reflected in the report;

(x)      Borrower delivers to Lender legal opinions satisfactory to Lender including (if Lender so requests in its sole discretion) a non-consolidation opinion(s) that the bankruptcy of any affiliate would not result in the substantive consolidation of Borrower or its assets in any affiliate's bankruptcy proceedings;

(xi)     Borrower continues to be a Single Purpose Entity; and

(xii)    When Lender receives the notice and when the proposed Permitted Transfer occurs, the release conditions set forth in the Cross Collateralization Agreement have been met to Lender's satisfaction and the Cross Collateralization Agreement has been released of Record.

(b)      Upon compliance with the conditions set forth in the preceding subsection, the following Transfers (the "**Permitted Transfers**") may occur without Lender's prior consent:

(i)      Transfers of membership interests in Borrower's sole member (i) among the Key Principals, (ii) to the estate of a Key Principal on account of the death of such person or (iii) to a trust or other entity for estate-planning purposes for the benefit of the spouse, any sibling, lineal ancestor or descendant (including a legally adopted

CO_DOCS_A #109558 v2                    26

child) and the spouse of any lineal ancestor or descendant of an Individual Key Principal, <u>provided</u> that, subsequent to any Transfer provided for above in this subsection, the following conditions are met:

(A) Borrower's sole member remains a Single Purpose Entity and continues to own and control not less than 100% of the membership interests in Borrower;

(B) The Individual Key Principals, either directly or through such trust or other entity for estate-planning purposes, or through EJM, continue to own and control not less than 51% of the membership interests in Borrower's sole member; and

(C) there is no change in the control or management of Borrower or the Property, except as approved in writing by Lender in its sole discretion.

(ii)    a one-time sale of the Property to an unaffiliated bona fide purchaser, <u>provided</u> that the following conditions are met:

(A) the transferee is owned and controlled by an entity with a net worth acceptable to Lender in its sole discretion;

(B) the transferee is a Single Purpose Entity sponsored by an Institutional Investor or a developer or manager of first-class commercial real estate comparable to the Property and having a reputation in the industry at least equivalent to that of Borrower as of the date of this Deed of Trust;

(C) the transferee has expressly assumed the obligations of Borrower under the Property Documents and under the Loan Documents;

(D) Borrower has delivered to Lender evidence satisfactory to Lender that, subsequent to the Transfer, the Property will be managed by a property manager having not less than 10 years experience managing first-class commercial real estate comparable to the Property, having a reputation in the industry at least equivalent to that of Borrower or the existing property manager as of the date of closing, and being otherwise satisfactory to Lender;

*Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 31 of 69*
*Order: 1 Comment:*

(E) Borrower pays to Lender a transfer fee of one percent (1%) of the outstanding principal balance of the Loan;

(F) the transferee delivers to Lender a non-consolidation opinion (in form and substance acceptable to Lender) with respect to the transferee and its constituent entities;

(G) if the Loan has been securitized, Lender has received confirmation from the rating agency(ies) which originally rated the securitization of the Loan that the rating of the securitization in effect immediately preceding the sale in question will not be down-graded as a result of such sale;

(H) Borrower delivers to Lender a substitute Environmental Indemnity, a substitute Guaranty and, if applicable, a substitute for any other guaranty or surety instrument, all in form satisfactory to Lender, executed by a substitute indemnitor, guarantor or surety, as the case may be, satisfactory to Lender in its sole discretion, provided that except in the case of damages or environmental problems resulting in whole or in part from acts or omissions of Borrower, Guarantors, Indemnitors, their agents or affiliates (i) the original Borrower and Guarantor will not be liable to Lender under the Note, Deed of Trust or Guaranty for any damages arising solely after and not on or before the date of the transfer of the Property, the assumption of the Loan and the substitution of Borrower, Guarantors and Indemnitors with Lender's prior written consent in accordance with the Loan Documents and (ii) upon satisfaction of the release conditions in the Environmental Indemnity, Indemnitor will not be liable to Lender under such Environmental Indemnity for environmental problems arising solely after and not on or before the date referenced in subparagraph (i); and

(I) Borrower delivers to Lender a replacement Rollover Letter of Credit in the amount and complying with the requirements of Section 5.6(c) hereof.

Section 12.3  Right to Contest Liens.  Borrower, at its own expense, may contest the amount, validity or application, in whole or in part, of any mechanic's, materialmen's or environmental liens in which event Lender will refrain from exercising any of the Remedies, provided that the following conditions are met:

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 32 of 69
Order: 1 Comment:

(i)     Borrower delivers to Lender notice of the proposed contest not more than 30 days after the lien is filed;

(ii)    the contest is by a Proceeding promptly initiated and conducted in good faith and with due diligence;

(iii)   there is no Event of Default other than the Event of Default arising from the filing of the lien;

(iv)    the Proceeding suspends enforcement of collection of the lien, imposition of criminal or civil penalties and sale or forfeiture of the Property and Lender will not be subject to any civil suit;

(v)     the Proceeding is permitted under and is conducted in accordance with the Leases and the Property Documents;

(vi)    Borrower sets aside reserves or furnishes a bond or other security satisfactory to Lender, in either case in an amount sufficient to pay the claim giving rise to the lien, together with all interest and penalties, or Borrower pays the contested lien under protest; and

(vii)   with respect to an environmental lien, Borrower is using best efforts to mitigate or prevent any deterioration of the Property resulting from the alleged violation of any Environmental Laws or the alleged Environmental Activity.

## ARTICLE XIII

## ADDITIONAL REPRESENTATIONS, WARRANTIES AND COVENANTS

Section 13.1 Further Assurances.

(a)     Borrower will execute, acknowledge and deliver to Lender or to any other entity Lender designates any additional or replacement documents and perform any additional actions that Lender determines are reasonably necessary to evidence, perfect or protect Lender's first lien on and prior security interest in the Property or to carry out the intent or facilitate the performance of the provisions of the Loan Documents.

(b)     Borrower appoints Lender as Borrower's attorney-in-fact to perform, at Lender's election, any actions and to execute and record any of the additional or replacement documents referred to in this Section, in each instance only at Lender's election and only to the extent Borrower has failed to comply with the terms of this Section.

Section 13.2 Estoppel Certificates.

(a)     Within 10 days of Lender's request, Borrower will deliver to Lender or to any entity Lender designates a certificate certifying (i) the original principal amount of the Note; (ii) the unpaid principal amount of the Note; (iii) the Fixed Interest Rate; (iv) the amount of the

then current Debt Service Payments; (v) the Maturity Date; (vi) the date a Debt Service Payment was last made; (vii) that, except as may be disclosed in the statement, there are no defaults or events which, with the passage of time or the giving of notice, would constitute an Event of Default; and (viii) there are no offsets or defenses against any portion of the Obligations except as may be disclosed in the statement.

(b)     If Lender requests, Borrower promptly will use its best efforts to deliver to Lender or to any entity Lender designates a certificate from each party to any Property Document, certifying that the Property Document is in full force and effect with no defaults or events which, with the passage of time or the giving of notice, would constitute an event of default under the Property Document and that there are no defenses or offsets against the performance of its obligations under the Property Document.

(c)     If Lender requests, Borrower promptly will use its best efforts to deliver to Lender, or to any entity Lender designates, a certificate from each tenant under a Lease then affecting the Property, certifying to any facts regarding the Lease as Lender may require, including that the Lease is in full force and effect with no defaults or events which, with the passage of time or the giving of notice, would constitute an event of default under the Lease by any party, that the rent has not been paid more than one month in advance and that the tenant claims no defense or offset against the performance of its obligations under the Lease.

Section 13.3  Single Purpose Entity.

(a)     Borrower covenants and agrees that Borrower is and will continue to be a Single Purpose Entity and, if Borrower is not a corporation, that each general partner or managing member of Borrower, as applicable, is and will continue to be a corporation or limited liability company and a Single Purpose Entity.  "**Single Purpose Entity**" means an entity whose organizational documents set forth single purpose entity covenants satisfactory to Lender, in its sole discretion, including covenants that the entity:

(i)     is formed solely for the purpose of owning and operating the Property;

(ii)     does not own and will not acquire any assets other than those related to its interest in and operation of the Property;

(iii)     may not incur any indebtedness other than the Loan and trade debt incurred in the ordinary course of business payable within 60 days and not to exceed in the aggregate 5% of the Loan and may not guarantee or assume the debt or obligations of any other entity, except as set forth in the Cross-Collateralization Agreement;

(iv)     holds itself out as a separate legal entity, conducts business in its own name, holds regular meetings, uses separate stationery, invoices, checks and logos and observes all other entity-level formalities;

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 34 of 69
Order: 1 Comment:

(v)     may not commingle its assets or funds with those of any other entity;

(vi)     prepares separate tax returns and financial statements and maintains books, records and accounts separate and apart from any other entity;

(vii)     pays its obligations and expenses from its own funds and allocates fairly any employees or overhead shared with affiliates;

(viii)     transacts business with affiliates on an arm's length basis pursuant to written agreements;

(ix)     requires the unanimous consent of all partners or members, as applicable, for any dissolution, winding up or bankruptcy or insolvency filing; and

(x)     may not amend its organizational documents with respect to the Single Purpose Entity requirements.

(b)     Borrower covenants and agrees that it has not and shall not:

(i)     engage in any business or activity other than the ownership, operation and maintenance of the Property, and activities incidental thereto;

(ii)     acquire or own any material assets other than (A) the Property, and (B) such incidental personal property as may be necessary for the operation of the Property;

(iii)     merge into or consolidate with any person or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure, without in each case Lender's consent;

(iv)     fail to preserve its existence as a person, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation, or without the prior written consent of Lender, amend, modify, terminate or fail to comply with the provisions of Borrower's partnership agreement, articles or certificate of incorporation, operating agreement or similar organizational documents, as the case may be, as same may be further amended or supplemented, if such amendment, modification, termination or failure to comply would adversely affect the ability of Borrower to perform its obligations hereunder, under the Note or under the other Loan Documents;\

CO_DOCS_A #109558 v2

31

(v)     own any subsidiary or make any investment in, any person without the consent of Lender;

(vi)    commingle its assets with the assets of any of its general partners, members, shareholders, affiliates, principals or of any other person;

(vii)   incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than the Debt and trade payables incurred in the ordinary course of business, provided the same do not exceed 5% of the Loan, are payable within 60 days and are paid when due, except as set forth in the Cross-Collateralization Agreement;

(viii)  fail to maintain its records, books of account and bank accounts separate and apart from those of the general partners, members, shareholders, principals and affiliates of Borrower, the affiliates of a general partner or member, or shareholder of Borrower, and any other person;

(ix)    enter into any contract or agreement with any general partner, member, shareholder, principal or affiliate of Borrower, Guarantor or Indemnitor, or any general partner, member, principal or affiliate thereof, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any general partner, member, shareholder, principal or affiliate of Borrower, Guarantor or Indemnitor, or any general partner, member, principal or affiliate thereof;

(x)     seek the dissolution or winding up in whole, or in part, of Borrower;

(xi)    maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any general partner, member, shareholder, principal or affiliate of Borrower, or any general partner, member, shareholder, principal or affiliate thereof or any other person;

(xii)   hold itself out to be responsible for the debts of another person;

(xiii)  make any loans or advances to any third party, including any general partner, member, shareholder, principal or affiliate of Borrower, or any general partner, principal or affiliate thereof;

(xiv)   fail to file its own tax returns;

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 36 of 69
Order: 1 Comment:

(xv)     agree to, enter into or consummate any transaction which would render Borrower not in compliance with Section 8.3 hereof;

(xvi)    fail either to hold itself out to the public as a legal person separate and distinct from any other person or to conduct its business solely in its own name in order not (A) to mislead others as to the identity with which such other party is transacting business, or (B) to suggest that Borrower is responsible for the debts of any third party (including any general partner, principal or affiliate of Borrower, or any general partner, principal or affiliate thereof);

(xvii)   fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations; or

(xviii)  file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, or make an assignment for the benefit of creditors.

(c)      If Borrower is a limited partnership or a limited liability company, by its execution of this Deed of Trust each general partner and each SPE Member of Borrower, as applicable, hereby covenants that such general partner or SPE Member is an entity whose sole asset is its interest in Borrower and each general partner or the SPE Member of Borrower, as applicable, will at all times comply, and will cause Borrower to comply, with each of the covenants contained in Sections 13.3(a) and (b) as if such covenant was made directly by such general partner or SPE Member. Only the SPE Member may be designated as a manager under the law where the Borrower is organized.

## ARTICLE XIV

## DEFAULTS AND REMEDIES

Section 14.1 Events of Default. The term "**Event of Default**" means the occurrence of any of the following events:

(i)      if Borrower fails to pay any amount due as and when required under the Note (without giving consideration to any grace period contained in the Loan Documents);

(ii)     if Borrower fails to pay any amount due as and when required under any Loan Document other than the Note, and the failure continues for a period of 5 days;

(iii)    if there is a default in the performance of any other provision of any Loan Document or if there is any inaccuracy or falsehood in any representation or warranty contained in any Loan Document which is not remedied within 30 days after Borrower receives

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 37 of 69
Order: 1 Comment:

notice thereof, <u>provided</u> that if the default, inaccuracy or falsehood is of a nature that it cannot be cured within the 30-day period and during that period Borrower commences to cure, and thereafter diligently continues to cure, the default, inaccuracy or falsehood, then the 30-day period will be extended for a reasonable period not to exceed 120 days after the notice to Borrower;

(iv)    if Borrower or any general partner or the SPE Member of Borrower violates or does not comply with any of the provisions of Section 13.3;

(v)    if Borrower makes a general assignment for the benefit of creditors or generally is not paying, or is unable to pay, or admits in writing its inability to pay, its debts as they become due; or if Borrower or any other party commences any Proceeding (a) relating to bankruptcy, insolvency, reorganization, conservatorship or relief of debtors, in each instance with respect to Borrower; (B) seeking to have an order for relief entered with respect to Borrower; (C) seeking attachment, distraint or execution of a judgment with respect to Borrower; (D) seeking to adjudicate Borrower as bankrupt or insolvent; (E) seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to Borrower or Borrower's debts; or (F) seeking appointment of a Receiver, trustee, custodian, conservator or other similar official for Borrower or for all or any substantial part of Borrower's assets, <u>provided</u> that if the Proceeding is commenced by a party other than Borrower or any of Borrower's general partners or members, Borrower will have 120 days to have the Proceeding dismissed or discharged before an Event of Default occurs;

(vi)    if Borrower is in default beyond any applicable grace and cure period under any other mortgage, deed of trust, deed to secure debt or other security agreement encumbering the Property whether junior or senior to the lien of this Deed of Trust;

(vii)    if a Transfer occurs except in accordance with the provisions of this Deed of Trust;

(viii)    if there is a default under the provisions of this Deed of Trust entitled, "<u>Compliance With Anti-Terrorism Laws</u>";

(ix)    if Borrower abandons the Property or ceases to conduct its business at the Property; or

(x)    if there is a default beyond any applicable grace and cure period under any guaranty in favor of Lender delivered to Lender in

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 38 of 69
Order: 1 Comment:

connection with the Loan or in connection with any loan cross-collateralized with the Loan.

Section 14.2 <u>Remedies</u>.

(a)   If an Event of Default occurs, Lender may take any of the following actions (the "**Remedies**") without notice to Borrower:

(i)   declare all or any portion of the Debt immediately due and payable ("**Acceleration**");

(ii)   pay or perform any Obligation;

(iii)   institute a Proceeding for the specific performance of any Obligation;

(iv)   apply for and obtain the appointment of a Receiver to be vested with the fullest powers permitted by Law, without bond being required, which appointment may be made ex parte, as a matter of right and without regard to the value of the Property, the amount of the Debt or the solvency of Borrower or any other person liable for the payment or performance of any portion of the Obligations;

(v)   directly, by its agents or representatives or through a Receiver appointed by a court of competent jurisdiction, enter on the Land and Improvements, take possession of the Property, dispossess Borrower and exercise Borrower's rights with respect to the Property, either in Borrower's name or otherwise. The previous portion of Section 14.2(a)(v) notwithstanding, Lender or Trustee may, prior or subsequent to the institution of any foreclosure proceedings, enter upon the Property, or any part thereof, and take exclusive possession of the Property and of all books, records, and accounts relating thereto and to exercise without interference from Borrower any and all rights which Borrower has with respect to the management, possession, operation, protection, or preservation of the Property, including without limitation the right to rent the same for the account of Borrower and to deduct from such Rents all costs, expenses, and liabilities of every character incurred by Lender or Trustee in collecting such Rents and in managing, operating, maintaining, protecting, or preserving the Property and to apply the remainder of such Rents on the Debt in such manner as Lender may elect. All such costs, expenses, and liabilities incurred by the Lender in collecting such Rents and in managing, operating, maintaining, protecting, or preserving the Property, if not paid out of Rents as hereinabove provided, shall constitute a demand obligation owing by Borrower and shall bear interest from the date of expenditure until paid at the Default Interest Rate as

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 39 of 69
Order: 1 Comment:

specified in the Note, all of which shall constitute a portion of the Debt. If necessary-to obtain the possession provided for above, Lender or Trustee may invoke any and all legal remedies to dispossess Borrower, including specifically one or more actions for forcible entry and detainer, trespass to title, and restitution. In connection with any action taken by Lender or Trustee pursuant to this subsection, Lender and Trustee shall not be liable for any loss sustained by Borrower resulting from any failure to let the Property, or any part thereof, or from any other act or omission of Lender or Trustee in managing the Property unless such loss is caused by the willful misconduct of Lender or Trustee, nor shall Lender or Trustee be obligated to perform or discharge any obligation, duty, or liability under any Lease or under or by reason hereof or the exercise of rights or remedies hereunder. Borrower shall and does hereby agree to indemnify Lender and Trustee for, and to hold Lender and Trustee harmless from, any and all liability, loss, or damage, which may or might be incurred by Lender or Trustee under any such Lease or under or by reason hereof or the exercise of rights or remedies hereunder, and from any and all claims and demands whatsoever which may be asserted against Lender or Trustee by reason of any alleged obligations or undertakings on their part to perform or discharge any of the terms, covenants, or agreements contained in any such Lease. Should Lender or Trustee incur any such liability, the amount thereof, including without limitation costs, expenses, and reasonable attorneys' fees, together with interest thereon from the date of expenditure until paid at the Default Interest Rate as specified in the Note, shall be secured hereby, and Borrower shall reimburse Lender and Trustee therefor immediately upon demand. Nothing in this subsection shall impose any duty, obligation, or responsibility upon Lender or Trustee for the control, care, management, leasing, or repair of the Property, nor for the carrying .out of any of the terms and conditions of any such Lease; nor shall it operate to make Lender or Trustee responsible or liable for any waste committed on the Property by the tenants or by any other parties, or for any Hazardous Substances or environmental conditions on or under the Property, or for any dangerous or defective condition of the Property or for any negligence in the management, leasing, upkeep, repair, or control of the Property resulting in loss or injury or death to any tenant, licensee, employee, or stranger. Borrower hereby assents to, ratifies, and confirms any and all actions of Lender and Trustee with respect to the Property taken under this subsection;

(vi)   institute a Proceeding for the foreclosure of this Deed of Trust or, if applicable, sell by power of sale all or any portion of the Property, in any court of competent jurisdiction;

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 40 of 69
Order: 1 Comment:

(vii)   institute a Proceeding for the partial foreclosure of this Deed of Trust for the portion of the Debt then due and payable, subject to the continuing lien of this Deed of Trust for the balance of the Debt not then due;

(viii)   deliver to Trustee a declaration of default and demand for sale and a notice of default and election to cause Borrower's interest in the Property to be sold, which notice Trustee or Lender will file in the official records of the county in which the Property is located;

(ix)   exercise any and all rights and remedies granted to a secured party under the Uniform Commercial Code; and

(x)   pursue any other right or remedy available to Lender at Law, in equity or otherwise.

(b)   If an Event of Default occurs, the license granted to Borrower in the Loan Documents to collect Rents will terminate automatically without any action required of Lender.

Section 14.3   General Provisions Pertaining to Remedies.

(a)   The Remedies are cumulative and may be pursued by Lender or Trustee concurrently or otherwise, at such time and in such order as Lender or Trustee may determine in their sole discretion and without presentment, demand, protest or further notice of any kind, all of which are expressly waived by Borrower.

(b)   The enumeration in the Loan Documents of specific rights or powers will not be construed to limit any general rights or powers or impair Lender's or Trustee's rights with respect to the Remedies.

(c)   If Lender or Trustee exercises any of the Remedies, Lender will not be deemed a mortgagee-in-possession unless Lender has elected affirmatively to be a mortgagee-in-possession.

(d)   Lender and Trustee will not be liable for any act or omission of Lender or Trustee in connection with the exercise of the Remedies.

(e)   Lender's and Trustee's right to exercise any Remedy will not be impaired by any delay in exercising or failure to exercise the Remedy and the delay or failure will not be construed as extending any cure period or constitute a waiver of the default or Event of Default.

(f)   If an Event of Default occurs, Lender's payment or performance or acceptance of payment or performance will not be deemed a waiver or cure of the Event of Default.

(g)   Lender's acceptance of partial payment or receipt of Rents will not extend or affect any grace period or constitute a waiver of a default or Event of Default or constitute a rescission of Acceleration, but will be credited against the Debt.

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 41 of 69
Order: 1 Comment:

Section 14.4 Foreclosure by Power of Sale.

(a)    Should Lender elect, following an Event of Default, to foreclose this Deed of Trust by exercise of the power of sale contained in this Deed of Trust, Lender will notify Trustee and deposit, if required by Trustee, with Trustee this Deed of Trust, the Note and such of the other Loan Documents as Trustee may require.

(b)    Upon receipt of the notice from Lender, Trustee will have recorded, published and delivered to Borrower any notice of default as is then required by Law.  Trustee will, without demand on Borrower after lapse of any time as may then be required by Law and after notice of sale having been given as required by Law, sell the Property at the time and place of sale fixed by it in the notice of sale, either as a whole, or in separate lots or parcels or items and in such order as Lender may direct Trustee so to do, at public auction to the highest bidder as provided by Law.  Trustee will deliver to the purchaser of the Property a good and sufficient deed or deeds conveying the Property so sold, but without any covenant or warranty, express or implied.    The recitals in the deed of any matter or fact will be conclusive proof of the truthfulness of the recitals.  Any person, including Borrower, Trustee or Lender may purchase at the sale, and Borrower will warrant and defend the title of the purchaser.

(c)    After deducting all costs, fees and expenses of Lender and Trustee, including costs of evidence of title in connection with sale, Lender will apply the proceeds of sale in the following priority, to payment of (i) first, all sums expended under the terms of the Loan Documents, not then repaid, with accrued interest at the Default Rate; (ii) second, the Debt in such order as Lender determines; and (iii) the remainder, if any to the person or persons legally entitled to it.

(d)    Trustee may postpone sale of all or any portion of the Property as permitted by Law, and without further notice make such sale at the time fixed by the last postponement, or may, in its discretion, give a new notice of sale.

(e)    A sale of less than the whole of the Property or any defective or irregular sale made under this Deed of Trust will not exhaust the power of sale provided for in this Deed of Trust; and subsequent sales may be made until the Obligations have been satisfied, or the entire Property sold, without defect or irregularity.

Section 14.5 General Provisions Pertaining to Receiver and other Remedies.

(a)    If an Event of Default occurs, any court of competent jurisdiction will, upon application by Lender, appoint a Receiver as designated in the application and issue an injunction prohibiting Borrower from interfering with the Receiver, collecting Rents, disposing of any Rents or any part of the Property, committing waste or doing any other act that will tend to affect the preservation of the Leases, the Rents and the Property and Borrower approves the appointment of the designated Receiver or any other Receiver appointed by the court.  Borrower agrees that the appointment may be made ex parte and as a matter of right to Lender or Trustee (and Borrower hereby consents to such appointments and waives notice of any application therefor), either before or after sale of the Property, without further notice, and without regard to the solvency or insolvency, at the time of application for the Receiver, of the person or persons,

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 42 of 69
Order: 1 Comment:

if any, liable for the payment of any portion of the Debt and the performance of any portion of the Obligations and without regard to the value of the Property or whether the Property is occupied as a homestead and without bond being required of the applicant.

(b)      The Receiver will be vested with the fullest powers permitted by Law including all powers necessary or usual in similar cases for the protection, possession and operation of the Property and all the powers and duties of Lender as a mortgagee-in-possession as provided in this Deed of Trust and may continue to exercise all the usual powers and duties until the Receiver is discharged by the court.

(c)      In addition to the Remedies and all other available rights, Lender or the Receiver may take any of the following actions:

(i)      take exclusive possession, custody and control of the Property and manage the Property so as to prevent waste;

(ii)     require Borrower to deliver to Lender or the Receiver all keys, security deposits, operating accounts, prepaid Rents, past due Rents, the Financial Books and Records and all original counterparts of the Leases and the Property Documents;

(iii)    collect, sue for and give receipts for the Rents and, after paying all expenses of collection, including reasonable receiver's, broker's and attorney's fees, apply the net collections to any portion of the Debt selected by Lender in its sole discretion;

(iv)     enter into, modify, extend, enforce, terminate, renew or accept surrender of Leases and evict tenants except that in the case of a Receiver, such actions may be taken only with the written consent of Lender as provided in this Deed of Trust and in the Assignment;

(v)      enter into, modify, extend, enforce, terminate or renew Property Documents except that in the case of a Receiver, such actions may be taken only with the written consent of Lender as provided in this Deed of Trust and in the Assignment;

(vi)     appear in and defend any Proceeding brought in connection with the Property and bring any Proceeding to protect the Property as well as Borrower's and Lender's respective interests in the Property (unless any such Proceeding has been assigned previously to Lender in the Assignment, or if so assigned, Lender has not expressly assigned such Proceeding to the Receiver and consented to such appearance or defense by Receiver); and

(vii)    perform any act in the place of Borrower that Lender or the Receiver deems necessary (A) to preserve the value, marketability or rentability of the Property; (B) to increase the gross receipts

*Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 43 of 69*
*Order: 1 Comment:*

from the Property; or (C) otherwise to protect Borrower's and Lender's respective interests in the Property.

(d)     Borrower appoints Lender as Borrower's attorney-in-fact, at Lender's election, to perform any actions and to execute and record any instruments necessary to effectuate the actions described in this Section, in each instance only at Lender's election and only to the extent Borrower has failed to comply with the provisions of this Section.

Section 14.6  General Provisions Pertaining to Foreclosures and the Power of Sale.  The following provisions will apply to any Proceeding to foreclose and to any sale of the Property by power of sale or pursuant to a judgment of foreclosure and sale:

(a)     Lender's or Trustee's right to institute a Proceeding to foreclose or to sell by power of sale will not be exhausted by a Proceeding or a sale that is defective or not completed or by conducting separate sales of portions of the Property;

(b)     any sale may be postponed or adjourned by Lender by public announcement at the time and place appointed for the sale without further notice;

(c)     with respect to sale pursuant to a judgment of foreclosure and sale, the Property may be sold as an entirety or in parcels, at one or more sales, at the time and place, on terms and in the order that Lender deems expedient in its sole discretion. The power of sale set forth above shall not be exhausted by any one or more sales as to any part of the Property which shall not have been sold ("and such power of sale may be exercised from time to time and as many times as Lender may deem necessary until all of the Property has been duly sold and all obligations secured hereby have been fully paid) nor by any sale which is not completed or which his defective in Lender's opinion, until the Debt shall have been paid in full;

(d)     if a portion of the Property is sold pursuant to this Article, the Loan Documents will remain in full force and effect with respect to any unmatured portion of the Debt and this Deed of Trust will continue as a valid and enforceable first lien on and security interest in the remaining portion of the Property, subject only to the Permitted Exceptions, without loss of priority and without impairment of any of Lender's or Trustee's rights and remedies with respect to the unmatured portion of the Debt;

(e)     Lender may bid for and acquire the Property at a sale and, in lieu of paying cash, may credit the amount of Lender's bid against any portion of the Debt selected by Lender in its sole discretion after deducting from the amount of Lender's bid the expenses of the sale, costs of enforcement and other amounts that Lender is authorized to deduct at Law, in equity or otherwise; and

(f)     Lender's receipt of the proceeds of a sale will be sufficient consideration for the portion of the Property sold and Lender will apply the proceeds as set forth in this Deed of Trust.

Section 14.7  Application of Proceeds.  Lender may apply the proceeds of any sale of the Property pursuant to a judgment of foreclosure and sale and any other amounts collected by Lender in connection with the exercise of the Remedies to payment of the Debt in such priority

CO_DOCS_A #109558 v2                                    40

and proportions as Lender may determine in its sole discretion or in such priority and proportions as required by Law.

Section 14.8 <u>Power of Attorney</u>. Borrower appoints Lender as Borrower's attorney-in-fact to perform any actions necessary and incidental to exercising the Remedies.

Section 14.9 <u>Tenant at Sufferance</u>. If Lender, Trustee, or a Receiver enters the Property in the exercise of the Remedies and Borrower is allowed to remain in occupancy of the Property, Borrower will pay to Lender, Trustee or the Receiver, as the case may be, in advance, a reasonable rent for the Property occupied by Borrower. If Borrower fails to pay the rent, Borrower may be dispossessed by the usual Proceedings available against defaulting tenants.

**ARTICLE XV**

**LIMITATION OF LIABILITY**

Section 15.1 <u>Limitation of Liability</u>.

(a)    Notwithstanding any provision in the Loan Documents to the contrary, except as set forth in subsections (b) and (c), if Lender seeks to enforce the collection of the Debt, Lender will foreclose this Deed of Trust instead of instituting suit on the Note. If a lesser sum is realized from a foreclosure of this Deed of Trust and sale of the Property than the then outstanding Debt, Lender will not institute any Proceeding against Borrower or Borrower's general partners, members or other constituents, if any, for or on account of the deficiency, except as set forth in subsections (b) and (c).

(b)    The limitation of liability in subsection (a) will not affect or impair (i) the lien of this Deed of Trust or Lender's other rights and Remedies under the Loan Documents, including Lender's right as mortgagee or secured party to commence an action to foreclose any lien or security interest Lender has under the Loan Documents; (ii) the validity of the Loan Documents or the Obligations; (iii) Lender's rights under any Loan Document that are not expressly non-recourse; or (iv) Lender's right to present and collect on any letter of credit or other credit enhancement document held by Lender in connection with the Obligations.

(c)    The following are excluded and excepted from the limitation of liability in subsection (a) and Lender may recover personally against Borrower and its general partners, members or other constituents, if any, and each Guarantor for the following:

        (i)    all losses suffered and liabilities and expenses incurred by Lender relating to any fraud or intentional misrepresentation or omission by Borrower or any of Borrower's partners, members, officers, directors, shareholders or principals in connection with (A) the performance of any of the conditions to Lender making the Loan; (B) any inducements to Lender to make the Loan; (C) the execution and delivery of the Loan Documents; (D) any certificates, representations or warranties given in connection with the Loan; or (E) Borrower's performance of the Obligations;

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 45 of 69
Order: 1 Comment:

(ii)     all Rents derived from the Property after a default under the Loan Documents which default is a basis of a Proceeding by Lender to enforce collection of the Debt and all moneys that, on the date such a default occurs, are on deposit in one or more accounts used by or on behalf of Borrower relating to the operation of the Property, except to the extent properly applied to payment of Debt Service Payments, Impositions, Insurance Premiums and any reasonable and customary expenses incurred by Borrower in the operation, maintenance and leasing of the Property or delivered to Lender;

(iii)    the cost of remediation of any Environmental Activity affecting the Property, any diminution in the value of the Property arising from any Environmental Activity affecting the Property and any other losses suffered and liabilities and expenses incurred by Lender relating to a default under the Article entitled "**Environmental**";

(iv)    all security deposits collected by Borrower or any of Borrower's predecessors and not refunded to Tenants in accordance with their respective Leases, applied in accordance with the Leases or Law or delivered to Lender, and all advance rents collected by Borrower or any of Borrower's predecessors and not applied in accordance with the Leases or delivered to Lender;

(v)     the replacement cost of any Fixtures or Personal Property removed from the Property after a default occurs;

(vi)    all losses suffered and liabilities and expenses incurred by Lender relating to any acts or omissions by Borrower that result in waste (including economic and non-physical waste) on the Property;

(vii)   all protective advances and other payments made by Lender pursuant to express provisions of the Loan Documents to protect Lender's security interest in the Property or to protect the assignment of the property described in and effected by the Assignment, but only to the extent that the Rents would have been sufficient to permit Borrower to make the payment and Borrower failed to do so;

(viii)  all mechanics' or similar liens relating to work performed on or materials delivered to the Property prior to Lender exercising its Remedies, but only to the extent Lender had advanced funds to pay for the work or materials;

(ix)    all Proceeds that are not applied in accordance with this Deed of Trust or not paid to Lender as required under this Deed of Trust;

(x)     all losses suffered and liabilities and expenses incurred by Lender relating to a Transfer that is not permitted under the Section

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 46 of 69
Order: 1 Comment:

entitled "**Permitted Transfers**" including the prohibition on any Transfer that results in a violation of ERISA or Anti-Terrorism Laws;

(xi)   all losses suffered and liabilities and expenses incurred by Lender relating to forfeiture or threatened forfeiture of the Property to the Government;

(xii)  all losses suffered and liabilities and expenses incurred by Lender relating to any default by Borrower under any of the provisions of this Deed of Trust relating to ERISA;

(xiii) all losses suffered and liabilities and expenses incurred by Lender relating to any default under any of the provisions of this Deed of Trust relating to Anti-Terrorism Laws;

(xiv)  all losses suffered and liabilities and expenses incurred by Lender relating to any default by Borrower or any general partner or SPE Member of Borrower under Section 13.3 of this Deed of Trust; and

(xv)   all tenant improvement costs and leasing commissions incurred by Lender to re-tenant any portion of the Property, provided that Borrower's personal liability under this subparagraph (xv) will not exceed $41,250.00.

(d)    Nothing under subparagraph (a) above will be deemed to be a waiver of any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code or under any other Law relating to bankruptcy or insolvency to file a claim for the full amount of the Debt or to require that all collateral will continue to secure all of the Obligations in accordance with the Loan Documents.

## ARTICLE XVI

### WAIVERS

**Section 16.1 WAIVER OF STATUTE OF LIMITATIONS.   BORROWER WAIVES THE RIGHT TO CLAIM ANY STATUTE OF LIMITATIONS AS A DEFENSE TO BORROWER'S PAYMENT AND PERFORMANCE OF THE OBLIGATIONS.**

**Section 16.2 WAIVER OF NOTICE.   BORROWER WAIVES THE RIGHT TO RECEIVE ANY NOTICE FROM LENDER OR TRUSTEE WITH RESPECT TO THE LOAN DOCUMENTS EXCEPT FOR THOSE NOTICES THAT LENDER OR TRUSTEE IS EXPRESSLY REQUIRED TO DELIVER PURSUANT TO THE LOAN DOCUMENTS.**

**Section 16.3 WAIVER OF MARSHALLING AND OTHER MATTERS. BORROWER WAIVES THE BENEFIT OF ANY RIGHTS OF MARSHALLING OR ANY OTHER RIGHT TO DIRECT THE ORDER IN WHICH ANY OF THE**

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 47 of 69
Order: 1 Comment:

PROPERTY WILL BE (i) SOLD; OR (ii) MADE AVAILABLE TO ANY ENTITY IF THE PROPERTY IS SOLD BY POWER OF SALE OR PURSUANT TO A JUDGMENT OF FORECLOSURE AND SALE. BORROWER ALSO WAIVES THE BENEFIT OF ANY LAWS RELATING TO APPRAISEMENT, VALUATION, STAY, EXTENSION, REINSTATEMENT, MORATORIUM, HOMESTEAD AND EXEMPTION RIGHTS OR A SALE IN INVERSE ORDER OF ALIENATION.

Section 16.4 WAIVER OF TRIAL BY JURY. BORROWER WAIVES TRIAL BY JURY IN ANY PROCEEDING BROUGHT BY, OR AGAINST, OR COUNTERCLAIM OR CROSS-COMPLAINT ASSERTED BY OR AGAINST, LENDER OR TRUSTEE RELATING TO THE LOAN, THE PROPERTY DOCUMENTS OR THE LEASES.

Section 16.5 WAIVER OF COUNTERCLAIM. BORROWER WAIVES THE RIGHT TO ASSERT A COUNTERCLAIM OR CROSS-COMPLAINT, OTHER THAN COMPULSORY OR MANDATORY COUNTERCLAIMS OR CROSS-COMPLAINTS, IN ANY PROCEEDING LENDER OR TRUSTEE BRINGS AGAINST BORROWER RELATING TO THE LOAN, INCLUDING ANY PROCEEDING TO ENFORCE REMEDIES.

Section 16.6 WAIVER OF JUDICIAL NOTICE AND HEARING. BORROWER WAIVES ANY RIGHT BORROWER MAY HAVE UNDER LAW TO NOTICE OR TO A JUDICIAL HEARING PRIOR TO THE EXERCISE OF ANY RIGHT OR REMEDY PROVIDED BY THE LOAN DOCUMENTS TO LENDER AND BORROWER WAIVES THE RIGHTS, IF ANY, TO SET ASIDE OR INVALIDATE ANY SALE DULY CONSUMMATED IN ACCORDANCE WITH THE PROVISIONS OF THE LOAN DOCUMENTS ON THE GROUND (IF SUCH BE THE CASE) THAT THE SALE WAS CONSUMMATED WITHOUT A PRIOR JUDICIAL HEARING.

Section 16.7 WAIVER OF SUBROGATION. BORROWER WAIVES ALL RIGHTS OF SUBROGATION TO LENDER'S RIGHTS OR CLAIMS RELATED TO OR AFFECTING THE PROPERTY OR ANY OTHER SECURITY FOR THE LOAN UNTIL THE LOAN IS PAID IN FULL AND ALL FUNDING OBLIGATIONS UNDER THE LOAN DOCUMENTS HAVE BEEN TERMINATED.

Section 16.8 GENERAL WAIVER. BORROWER ACKNOWLEDGES THAT (a) BORROWER AND BORROWER'S PARTNERS, MEMBERS OR PRINCIPALS, AS THE CASE MAY BE, ARE KNOWLEDGEABLE BORROWERS OF COMMERCIAL FUNDS AND EXPERIENCED REAL ESTATE DEVELOPERS OR INVESTORS WHO UNDERSTAND FULLY THE EFFECT OF THE ABOVE PROVISIONS; (B) LENDER WOULD NOT MAKE THE LOAN WITHOUT THE PROVISIONS OF THIS ARTICLE; (C) THE LOAN IS A COMMERCIAL OR BUSINESS LOAN UNDER THE LAWS OF THE STATE OR COMMONWEALTH WHERE THE PROPERTY IS LOCATED NEGOTIATED BY LENDER AND BORROWER AND THEIR RESPECTIVE ATTORNEYS AT ARMS LENGTH; AND (D) ALL WAIVERS BY BORROWER IN THIS ARTICLE HAVE BEEN MADE VOLUNTARILY, INTELLIGENTLY AND KNOWINGLY, AFTER BORROWER FIRST HAS BEEN INFORMED BY COUNSEL OF BORROWER'S OWN CHOOSING AS TO POSSIBLE ALTERNATIVE RIGHTS,

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 48 of 69
Order: 1 Comment:

AND HAVE BEEN MADE AS AN INTENTIONAL RELINQUISHMENT AND ABANDONMENT OF A KNOWN RIGHT AND PRIVILEGE. THE FOREGOING ACKNOWLEDGMENT IS MADE WITH THE INTENT THAT LENDER AND ANY SUBSEQUENT HOLDER OF THE NOTE WILL RELY ON THE ACKNOWLEDGMENT.

### ARTICLE XVII

### NOTICES

Section 17.1 <u>Notices</u>. All acceptances, approvals, consents, demands, notices, requests, waivers and other communications (the "<u>Notices</u>") required or permitted to be given under the Loan Documents must be in writing and (a) delivered personally by a process server providing a sworn declaration evidencing the date of service, the individual served, and the address where the service was made; (b) sent by certified mail, return receipt requested; or (c) delivered by nationally recognized overnight delivery service that provides evidence of the date of delivery, with all charges prepaid (for next morning delivery if sent by overnight delivery service), addressed to the appropriate party at its address listed below:

| | |
|---|---|
| If to Lender: | CapMark Services, L.P. |
| | 245 Peachtree Center Avenue, NE |
| | Suite 1800 |
| | Atlanta, Georgia 30303-1231 |
| | Attention: Portfolio Manager and Legal Department |
| | |
| with a courtesy copy to: | Lend Lease Mortgage Capital, L.P. |
| | 700 North Pearl Street, Suite 2400 |
| | Dallas, Texas 75201-7424 |
| | Attention: Ted C. Norman, Vice President, Mortgage Capital Division |
| | Authorization I.D. #AAA0538 |
| | Investment I.D. #000524000 |
| | |
| and | Teachers Insurance and Annuity Association of America |
| | 730 Third Avenue |
| | New York, New York 10017 |
| | Attention: Vice President and Chief Counsel - Mortgage and Real Estate Law |
| | Authorization I.D. #AAA0194 |
| | Investment I.D. #000523800 |

CO_DOCS_A #109558 v2

45

*Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 49 of 69 Order: 1 Comment:*

| and | Teachers Insurance and Annuity Association of America |
|---|---|
| | 730 Third Avenue |
| | New York, New York  10017 |
| | Attention:  Vice President and Chief Counsel - Mortgage |
| | and Real Estate Law |
| | Authorization I.D. #AAA0538 |
| | Investment I.D. #000524000 |
| | |
| If to Borrower: | EJM Kyrene Property LLC |
| | 7975 N. Hayden Road, Suite D-363 |
| | Scottsdale, Arizona  85258 |
| | Attention:  Jerry Monkarsh |
| | |
| with a courtesy copy to: | EJM Development Co. |
| | 9061 Santa Monica Boulevard |
| | Los Angeles, California |
| | Attention:  Patrick R. Obel, Esq. |
| | |
| If to Trustee: | First American Title Insurance Company |
| | 1030 E. Baseline Road, Suite 158 |
| | Tempe, Arizona, 85283 |

Lender and Borrower each may change from time to time the address to which Notices must be sent, by notice given in accordance with the provisions of this Section.  All Notices given in accordance with the provisions of this Section will be deemed to have been received on the earliest of (i) actual receipt; (ii) Borrower's rejection of delivery; or (iii) 3 Business Days after having been deposited in any mail depository regularly maintained by the United States postal service, if sent by certified mail, or 1 Business Day after having been deposited with a nationally recognized overnight delivery service, if sent by overnight delivery or on the date of personal service, if served by a process server.

Section 17.2 <u>Change in Borrower's Legal Name, Place of Business or State of Formation</u>.  Borrower will notify Lender in writing prior to any change in Borrower's legal name, place of business or state of organization, including as a result of, or in connection with, any Transfer, including any Permitted Transfer.

## ARTICLE XVIII

## SECONDARY MARKET

Section 18.1 <u>Dissemination of Information</u>.  If Lender  determines at any time to sell, transfer or assign the Note, this Deed of Trust and the other Loan Documents, and any or all servicing rights with respect thereto, or to grant participations therein (the "**Participations**") or issue mortgage pass-through certificates or other securities (such sale and/or issuance, the

"**Securitization**") evidencing a beneficial interest in a rated or unrated public offering or private placement (the "**Securities**"), Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor, or their respective successors in such Participations and/or Securities (collectively, the "**Investor**") or any rating agency rating such Securities and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Debt and to Borrower, any Guarantor, any Indemnitors and the Property (including, without limitation, all financial statements), which shall have been furnished by Borrower, any Guarantor or any Indemnitors, as Lender determines necessary or desirable. Borrower, any Guarantor and any Indemnitor agree to cooperate with Lender in connection with any transfer made or any Securities created pursuant to this Section, including, without limitation, the delivery of an estoppel certificate required in accordance with Section 13.2 hereof and such other documents as may be reasonably requested by Lender and, upon Lender's reasonable request, meeting with any rating agency for due diligence purposes. Borrower shall also furnish and Borrower, any Guarantor and any Indemnitor consent to Lender furnishing to such Investors or such prospective Investors or any rating agency any and all information in Borrower's possession or control concerning the Property, the Leases, the financial condition of Borrower, any Guarantor and any Indemnitor as may be reasonably requested by Lender, any Investor or any prospective Investor or rating agency in connection with any sale, transfer or Participation. Borrower shall deliver on the date hereof, at Borrower's sole cost and expense, a nonconsolidation opinion (in form and substance acceptable to Lender), and within ten (10) days after demand of Lender, an update of same (which update Borrower will not be required to provide more than once), each in form and substance and delivered by counsel acceptable to Lender and the rating agency rating or proposed to rate the Securities, as may be required by Lender and/or such rating agency; provided, however, that Borrower will not be required to deliver any such update if Borrower delivers to Lender, within the ten (10) day period, a certification, satisfactory to Lender in its reasonable discretion, that the facts and assumptions underlying the original nonconsolidation opinion remain true and in full force.. Borrower's failure to deliver the opinions required hereby shall constitute an Event of Default hereunder.

## ARTICLE XIX

### MISCELLANEOUS

Section 19.1 Applicable Law. The Loan Documents are governed by and will be construed in accordance with the Laws of the state or commonwealth in which the Property is located without regard to conflict of law provisions except to the extent that the Uniform Commercial Code requires otherwise.

Section 19.2 Usury Limitations. Borrower and Lender intend to comply with all Laws with respect to the charging and receiving of interest. Any amounts charged or received by Lender for the use or forbearance of the Principal to the extent permitted by Law, will be amortized and spread throughout the Term until payment in full so that the rate or amount of interest charged or received by Lender on account of the Principal does not exceed the Maximum Interest Rate. If any amount charged or received under the Loan Documents that is deemed to be interest is determined to be in excess of the amount permitted to be charged or received at the Maximum Interest Rate, the excess will be deemed to be a prepayment of Principal when paid, without premium, and any portion of the excess not capable of being so applied will be refunded

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 51 of 69
Order: 1 Comment:

to Borrower. If during the Term the Maximum Interest Rate, if any, is eliminated, then for purposes of the Loan, there will be no Maximum Interest Rate.

Section 19.3  Lender's Discretion.  Wherever under the Loan Documents any matter is required to be satisfactory to Lender, Lender has the right to approve or determine any matter or Lender has an election, Lender's approval, determination or election will be made in Lender's reasonable discretion unless expressly provided to the contrary.

Section 19.4  Unenforceable Provisions.  If any provision in the Loan Documents is found to be illegal or unenforceable or would operate to invalidate any of the Loan Documents, then the provision will be deemed expunged and the Loan Documents will be construed as though the provision was not contained in the Loan Documents and the remainder of the Loan Documents will remain in full force and effect.

Section 19.5  Survival of Borrower's Obligations.  Borrower's representations, warranties and covenants contained in the Loan Documents will continue in full force and effect and survive (i) satisfaction of the Obligations; (ii) reconveyance of the lien of this property by Trustee; (iii) assignment or other transfer of all or any portion of Lender's interest in the Loan Documents or the Property; (iv) Lender's or Trustee's exercise of any of the Remedies or any of Lender's or Trustee's other rights under the Loan Documents; (v) a Transfer; (vi) amendments to the Loan Documents; and (vii) any other act or omission that might otherwise be construed as a release or discharge of Borrower.

Section 19.6  Relationship Between Borrower and Lender; No Third Party Beneficiaries.

(a)  Lender is not a partner of or joint venturer with Borrower or any other entity as a result of the Loan or Lender's rights under the Loan Documents; the relationship between Lender and Borrower is strictly that of creditor and debtor. Each Loan Document is an agreement between the parties to that Loan Document for the mutual benefit of the parties and no entities other than the parties to that Loan Document will be a third party beneficiary or will have any claim against Lender or Borrower by virtue of the Loan Document. As between Lender and Borrower, any actions taken by Lender under the Loan Documents will be taken for Lender's protection only, and Lender has not and will not be deemed to have assumed any responsibility to Borrower or to any other entity by virtue of Lender's actions.

(b)  All conditions to Lender's performance of its obligations under the Loan Documents are imposed solely for the benefit of Lender. No entity other than Lender will have standing to require satisfaction of the conditions in accordance with their provisions or will be entitled to assume that Lender will refuse to perform its obligations in the absence of strict compliance with any of the conditions.

Section 19.7  Partial Reconveyances or Releases, Extensions, Waivers.  Lender may: (i) permit the reconveyance of any part of the Property or release any entity obligated for the Obligations; (ii) extend the time for payment or performance of any of the Obligations or otherwise amend the provisions for payment or performance by agreement with any entity that is obligated for the Obligations or that has an interest in the Property; (iii) accept additional security for the payment and performance of the Obligations; and (iv) waive any entity's

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 52 of 69
Order: 1 Comment:

performance of an Obligation, release any entity or individual now or in the future liable for the performance of the Obligation or waive the exercise of any Remedy or option. Lender may exercise any of the foregoing rights without notice, without regard to the amount of any consideration given, without affecting the priority of the Loan Documents, without releasing any entity not specifically released from its obligations under the Loan Documents, without releasing any guarantor(s) or surety(ies) of the Obligations, without effecting a novation of the Loan Documents and, with respect to a waiver, without waiving future performance of the Obligation or exercise of the Remedy waived.

Section 19.8  Service of Process.  Borrower irrevocably consents to service of process by registered or certified mail, postage prepaid, return receipt requested, to Borrower at its address set forth in the Article entitled "Notices".

Section 19.9  Entire Agreement.  Oral agreements or commitments between Borrower and Lender to lend money, to extend credit or to forbear from enforcing repayment of a debt, including promises to extend or renew the debt, are not enforceable. Any agreements among Borrower, Lender and Trustee relating to the Loan are contained in the Loan Documents, which contain the complete and exclusive statement of the agreements among Borrower, Lender and Trustee, except as Borrower, Lender and, if applicable, Trustee may later agree in writing to amend the Loan Documents. The language of each Loan Document will be construed as a whole according to its fair meaning and will not be construed against the draftsman.

Section 19.10  No Oral Amendment.  The Loan Documents may not be amended, waived or terminated orally or by any act or omission made individually by Borrower, Lender or Trustee but may be amended, waived or terminated only by a written document signed by the party against which enforcement of the amendment, waiver or termination is sought.

Section 19.11  Severability.  The invalidity, illegality or unenforceability of any provision of any of the Loan Documents will not affect any other provisions of the Loan Documents, which will be construed as if the invalid, illegal or unenforceable provision never had been included.

Section 19.12  Covenants Run with the Land.  Subject to the restrictions on transfer contained in the Article entitled "TRANSFERS, LIENS AND ENCUMBRANCES", all of the covenants of this Deed of Trust and the Assignment run with the Land, will bind all parties hereto and all tenants and subtenants of the Land or the Improvements and their respective heirs, executors, administrators, successors and assigns, and all occupants and subsequent owners of the Property, and will inure to the benefit of Lender and all subsequent holders of the Note and this Deed of Trust.

Section 19.13  Time of the Essence.  Time is of the essence with respect to Borrower's payment and performance of the Obligations.

Section 19.14  Subrogation.  If the Principal or any other amount advanced by Lender is used directly or indirectly to pay off, discharge or satisfy all or any part of an encumbrance affecting the Property, then Lender is subrogated to the encumbrance and to any security held by

CO_DOCS_A #109556 v2                    49

the holder of the encumbrance, all of which will continue in full force and effect in favor of Lender as additional security for the Obligations.

Section 19.15 <u>Joint and Several Liability</u>.  If Borrower consists of more than one person or entity, the obligations and liabilities of each such person or entity under this Deed of Trust are joint and several.

Section 19.16 <u>Successors and Assigns</u>.  The Loan Documents bind the parties to the Loan Documents and their respective successors, assigns, heirs, administrators, executors, agents and representatives and inure to the benefit of Lender and its successors, assigns, heirs, administrators, executors, agents and representatives and to the extent applicable inure to the benefit of Trustee and its successors, assigns, heirs, administrators, executors, agents and representatives.

Section 19.17 <u>Duplicates and Counterparts</u>.  Duplicate counterparts of any of the Loan Documents, other than the Note, may be executed and together will constitute a single original document.

**ARTICLE XX**

**TRUSTEE PROVISIONS**

Section 20.1 <u>Acceptance of Trust</u>.

(a)     Trustee accepts this Trust upon recordation of this Deed of Trust as provided by Law.  Except as provided by Law, Trustee is not obligated to notify any party of a pending sale under this Deed of Trust or of a Proceeding in which Borrower, Lender or Trustee is a party.

(b)     Lender may from time to time unilaterally substitute a successor to Trustee pursuant to a recordable instrument that complies with Law for substitution of Trustees. The recorded substitution will be conclusive proof of proper substitution of trustee who will, without conveyance from predecessor trustee, succeed to all of the predecessor trustee's title, estate, rights, powers and duties.

**[Remainder of page intentionally left blank]**

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 54 of 69
Order: 1 Comment:

IN WITNESS WHEREOF, Borrower has executed and delivered this Deed of Trust as of the date first set forth above.

EJM KYRENE PROPERTY LLC, an Arizona limited liability company

By:    EJM KYRENE SPE LLC, an Arizona limited liability company, its sole member

        By:    EJM DEVELOPMENT CO., a California limited partnership, its sole member

        By: _____
        Name: EUGENE MONKARSH
        Title: GENERAL PARTNER

EJM Kyrene SPE LLC has executed this Deed of Trust for the purpose of acknowledging its individual covenants contained in Section 13.3.

EJM KYRENE SPE LLC, an Arizona limited liability company

By:    EJM DEVELOPMENT CO., a California limited partnership, its sole member

    By: _____
    Name: EUGENE MONKARSH
    Title: GENERAL PARTNER

*Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 55 of 69 Order: 1 Comment:*

ACKNOWLEDGMENTS

State of California        )
                           )ss:
County of LOS ANGELES      )

On JUNE 10 , 2002, before me, JULIE WEINBERG , Notary Public, personally appeared EUGENE MONYARIH as GENERAL PARTNER of EJM Development Co., as sole member of EJM Kyrene SPE LLC, as sole member of EJM Kyrene Property LLC, an Arizona limited liability company, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the within instrument.

WITNESS my hand and official seal.

JULIE WEINBERG
Commission # 1252468
Notary Public — California
Los Angeles County
My Comm. Expires Feb 4, 2004

_____
Notary Public

State of California        )
                           )ss:
County of LOS ANGELES      )

On JUNE 10 , 2002, before me, JULIE WEINBERG , Notary Public, personally appeared EUGENE MONYARIH as GENERAL PARTNER of EJM Development Co., as sole member of EJM Kyrene SPE LLC, an Arizona limited liability company, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the within instrument.

WITNESS my hand and official seal.

JULIE WEINBERG
Commission # 1252468
Notary Public — California
Los Angeles County
My Comm. Expires Feb 4, 2004

_____
Notary Public

CO_DOCS_A #109558 v2                    52

*Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 56 of 69*
*Order: 1 Comment:*

I hereby certify that the precise address of the within named Lender, as mortgagee, is:

LEND LEASE MORTGAGE CAPITAL, L.P.
700 North Pearl Street, Suite 2400
Dallas, Texas 75201-7424

[CORPORATE SEAL]

By: *Pearl Mortgage, Inc., its G. P.*

By: _____
Name: *H. Stewart Carrico II*
Title: *Vice President*

Attest: _____
Name: *Bob Adams*
Title: *Asst Sec*

Lend Lease Mortgage Capital, L.P.

STATE OF TEXAS )
                        ) ss.,
COUNTY OF *Dallas* )

On this *17th* day of *June*, 2002, personally appeared the above-named *H. Stewart Carrico II*, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that s/he executed the same in his/her authorized capacity as *Vice President* of Pearl Mortgage Inc., a Delaware corporation, the general partner of Lend Lease Mortgage Capital, L.P., and that by his/her signature on the instrument, Lend Lease Mortgage Capital, L.P. executed the instrument.

WITNESS my hand and official seal this *17th* day of *June*, 200*2*.

[Notary seal:
SHERRY L. WATSON
Notary Public, State of Texas
Commission Expires
NOVEMBER 30, 2005]

_____
Notary Public
Name: (Printed) *Sherry L. Watson*

My Commission Expires:_____

CO_DOCS_A #109558 v2

53

*Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 57 of 69*
*Order: 1 Comment:*

Exhibit A

LEGAL DESCRIPTION                    No. 257-1383637

PARCEL NO. 1:

That portion of the Southeast quarter of Section 16, Township 1 South, Range 4 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, described as follows:

COMMENCING at the East quarter corner of said Section 16;

thence North 89 degrees 52 minutes 00 seconds West, along the East-West mid-section line of said Section 16, a distance of 33.00 feet to the POINT OF BEGINNING;

thence South 00 degrees 00 minutes 12 seconds East, parallel to and 33.00 feet West of the East line of said Section 16, a distance of 633.12 feet;

thence North 89 degrees 51 minutes 47 seconds West (North 89 degrees 52 minutes 00 seconds West, record) parallel to the said East-West mid-section line, 778.82 feet to a point on the Easterly right-of-way line of the Southern Pacific Railroad;

thence North 16 degrees 00 minutes 37 seconds East, along said right-of-way line, 658.23 feet to a point on the East-West mid-section line;

thence South 89 degrees 51 minutes 47 seconds East (South 89 degrees 52 minutes 00 seconds East, record) along said mid-section line, 597.23 feet to the POINT OF BEGINNING;

EXCEPT the North 40 feet; and

EXCEPT the East 22 feet thereof.

PARCEL NO. 2:

That portion of the Southeast quarter of Section 16, Township 1 South, Range 4 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, described as follows:

COMMENCING at the East quarter corner of said Section 16;

thence North 89 degrees 52 minutes 00 seconds West, along the East-West mid-section line of said Section 16, a distance of 33.00 feet;

thence South 00 degrees 00 minutes 12 seconds East, parallel to and 33.00 feet West of the East line of said Section 16, a distance of 633.12 feet to the POINT OF BEGINNING;

thence continuing South 00 degrees 00 minutes 12 seconds East, 266.57 feet;

thence North 89 degrees 51 minutes 47 seconds West (North 89 degrees 52 minutes 00 seconds West, record) parallel to the said East-West mid-section line, 855.27 feet to a point on the Easterly right-of-way line of the Southern Pacific Railroad;

CO_DOCS_A #109558 v2                                54

thence North 16 degrees 00 minutes 37 seconds East, along said right-of-way line, 277.14 feet;

thence South 89 degrees 51 minutes 47 seconds East (South 89 degrees 52 minutes 00 seconds East, record) parallel to the said East-West mid-section line, 778.82 feet to the POINT OF BEGINNING;

EXCEPT the East 22 feet thereof.

PARCEL NO. 3:

That portion of the Southeast quarter of Section 16, Township 1 South, Range 4 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, described as follows:

COMMENCING at the East quarter corner of said Section 16;

thence North 89 degrees 52 minutes 00 seconds West, along the East-West mid-section line of said Section 16, a distance of 33.00 feet;

thence South 00 degrees 00 minutes 12 seconds East, parallel to and 33.00 feet West of the East line of said Section 16, a distance of 899.69 feet to the POINT OF BEGINNING;

thence continuing South 00 degrees 00 minutes 12 seconds East, 471.96 feet;

thence North 89 degrees 51 minutes 47 seconds West (North 89 degrees 52 minutes West, record) parallel to the said East-West mid-section line, 990.63 feet to a point on the Easterly right-of-way line of the Southern Pacific Railroad;

thence North 16 degrees 00 minutes 37 seconds East, along said right-of-way line, 490.67 feet (490.69 feet record);

thence South 89 degrees 51 minutes 47 seconds East (South 89 degrees 52 minutes 00 seconds East, record) parallel to the said East-West mid-section line, 855.27 feet to the POINT OF BEGINNING;

EXCEPT the East 22 feet; and also

EXCEPT commencing at the Northeast corner of said Southeast quarter;

thence South 00 degrees 00 minutes 12 seconds East along the East line of said Southeast quarter, 1371.65 feet (1371.92 feet, record);

thence North 89 degrees 51 minutes 47 seconds West (North 89 degrees 52 minutes 00 seconds West, record), parallel to the North line of said Southeast quarter, 55.00 feet to the POINT OF BEGINNING;

thence continuing North 89 degrees 51 minutes 47 seconds West (North 89 degrees 52 minutes 00 seconds West, record), parallel to the North line of said Southeast quarter, 208.71 feet;

thence North 00 degrees 00 minutes 12 seconds West, parallel to the East line of said Southeast quarter, 208.71 feet;

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 59 of 69
Order: 1 Comment:

thence South 89 deg      31 minutes 47 seconds East (South 89 deg      52 minutes 00 seconds East, record), paralle.  . the North line of said Southeast quarter, 2L    . feet to a point 55 feet West of the East line of said Southeast quarter;

thence South 00 degrees 00 minutes 12 seconds East, parallel with and 55 feet West of the East line of said Southeast quarter, 208.71 feet to the POINT OF BEGINNING; and

EXCEPT commencing at the Northeast corner of said Southeast quarter;

thence South 00 degrees 00 minutes 12 seconds East along the East line of said Southeast quarter, 1371.65 feet (1371.92 feet, record);

thence North 89 degrees 51 minutes 47 seconds West (North 89 degrees 52 minutes 00 seconds West, record), parallel to the North line of said Southeast quarter, 263.71 feet to the POINT OF BEGINNING;

thence continuing North 89 degrees 51 minutes 47 seconds West (North 89 degrees 52 minutes 00 seconds West, record), parallel to the North line of said Southeast quarter, 208.71 feet;

thence North 00 degrees 00 minutes 12 seconds West, parallel to the East line of said Southeast quarter, 208.71 feet;

thence South 89 degrees 51 minutes 47 seconds East (South 89 degrees 52 minutes 00 seconds East, record) parallel to the North line of said Southeast quarter, 208.71 feet to a point 263.71 feet West of the East line of said Southeast quarter;

thence South 00 degrees 00 minutes 12 seconds East, parallel with and 263.71 feet West of the East line of said Southeast quarter, 208.71 feet to the POINT OF BEGINNING.

Exhibit B

DEFINITIONS

"**Acceleration**" is defined in Section 14.2(a)(i).

"**Accumulations**" is defined in Section 2.1.

"**Accumulations Depositary**" is defined in Section 6.2(a).

"**Additional Funds**" is defined in Section 7.4(v).

"**Annual Financial Statement**" is defined in Section 10.1(a).

"**Anti-Terrorism Law**" is defined as any Law relating to terrorism or money-laundering, including Executive Order No. 13224 and the USA Patriot Act.

"**Assessments**" is defined as all assessments now or hereafter levied, assessed or imposed against the Property.

"**Assignment**" is defined as the Assignment of Leases and Rents dated of even date with this Deed of Trust made by Borrower for the benefit of Lender.

"**Bankruptcy Code**" means Title 11 of the United States Code.

"**Borrower**" is defined in the introductory paragraph.

"**Business Days**" is defined as any day on which commercial banks are not authorized or required by Law to close in New York, New York.

"**Capital Expenditures Deposit Event**" is defined in Section 6.4 (a).

"**Capital Expenditures Depositary**" is defined in Section 6.4 (a).

"**Capital Expenditures Reserves**" is defined as any money and all deposits held from time to time by the Capital Expenditures Depositary to provide reserves for Capital Expenditures.

"**Capital Expenditures Reserve Account**" is defined in Section 6.4 (b).

"**Casualty**" is defined as damage to or destruction of the Property by fire or other casualty.

"**Code**" is defined as the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

"**Commitment**" is defined as that Loan Application and Commitment Agreement dated February 21, 2002 between Lender and EJM on behalf of Borrower.

"**Condemnation**" is defined as the permanent or temporary taking of all or any portion of the Property, or any interest therein or right accruing thereto, by the exercise of the right of eminent

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 61 of 69
Order: 1 Comment:

domain (including any transfer in lieu of or in anticipation of the exercise of the right), inverse condemnation or any similar injury or damage to or decrease in the value of the Property, including severance and change in the grade of any streets

"**Condemnation Awards**" is defined in Section 2.1(viii).

"**Condemnation Proceeding**" is defined as a Proceeding that could result in a Condemnation.

"**CPA**" is defined as an independent certified public accountant satisfactory to Lender.

"**Cross-Collateralization Agreement**" is defined in Section 2.5.

"**Debt**" is defined in Section 3.1.

"**Debt Service Payments**" is defined as the monthly installments of principal and interest payable by Borrower to Lender as set forth in the Note.

"**Debt Service Coverage Shortfall**" is defined as the event occurring when the net operating income from the Property for a calendar quarter divided by the aggregate Debt Service Payments for such calendar quarter is less than 1.15.

"**Deed of Trust**" is defined as this Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing Statement.

"**Default Interest Rate**" is defined as the lower of (a) 5% per annum over the Fixed Interest Rate or (b) the Maximum Interest Rate, if any.

"**Depositary**" is defined in Section 6.5.

"**Deposits**" is defined in Section 6.5.

"**Destruction Event**" is defined in Section 7.4.

"**EJM**" is defined as EJM Development Co., a California limited partnership.

"**Environmental Activity**" is defined as any actual, suspected or threatened abatement, cleanup, disposal, generation, handling, manufacture, possession, release, remediation, removal, storage, transportation, treatment or use of any Hazardous Substances. The actual, suspected or threatened presence of any Hazardous Substances, or the actual, suspected or threatened noncompliance with any Environmental Laws, will be deemed Environmental Activity.

"**Environmental Indemnity**" is defined as that certain Environmental Indemnity, dated the date of this Deed of Trust, executed by Indemnitor for the benefit of Lender.

"**Environmental Laws**" is defined as all Laws pertaining to health, safety, protection of the environment, natural resources, conservation, wildlife, waste management, Environmental Activities and pollution.

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 62 of 69
Order: 1 Comment:

"**Environmental Report**" is defined as the report prepared by Jacques Whitford Company, Inc., dated May 17, 2002, as amended.

"**ERISA**" is defined in Section 8.3(a).

"**Event of Default**" is defined in Section 14.1.

"**Executive Order No. 13224**" is defined as the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism.

"**Existing Members**" is defined in Section 12.1(b).

"**Expenses**" is defined in Section 11.1(a).

"**Financial Books and Records**" is defined as detailed accounts of the income and expenses of the Property and of Borrower and all other data, records and information that either are specifically referred to in the Article entitled "**FINANCIAL REPORTING**" or are necessary to the preparation of any of the statements, reports or certificates required under such Article and includes all supporting schedules prepared or used by the CPA in auditing the Annual Financial Statement or in issuing its opinion.

"**Fiscal Year**" is defined as any calendar year or partial calendar year during the Term.

"**Fixed Interest Rate**" is defined as 6.90% per annum.

"**GAAP**" is defined as generally accepted accounting principles.

"**Government**" is defined as any federal, state or municipal governmental or quasi-governmental authority including executive, legislative or judicial branch, division and any subdivision or agency of any of them and any entity to which any of them has delegated authority.

"**Guarantor**" is defined in the second paragraph of the Guaranty of Recourse Obligations of Borrower delivered to Lender in connection with the Loan.

"**Guaranty**" is defined as that certain Guaranty of Recourse Obligations of Borrower, dated the date of this Deed of Trust, executed by Guarantor for the benefit of Lender.

"**Hazardous Substances**" is defined as (i) any by product, chemical, compound, material, mixture or substance that is now or hereafter defined or listed in, or otherwise classified pursuant to, any Environmental Laws, as a "hazardous substance", "hazardous material", "hazardous waste", "extremely hazardous waste", "infectious waste", "toxic substance", "toxic pollutant", or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, toxicity, reproductive toxicity, or "EP toxicity", (ii) any petroleum, natural gas, natural gas liquid, liquified natural gas, synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas), ash produced by a resource recovery facility utilizing a municipal solid waste stream, and drilling fluids, produced

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 63 of 69
Order: 1 Comment:

waters, and other wastes associated with the exploration, development or production of crude oil, natural gas, or geothermal resources, and (iii) any underground storage tanks.

"**Imposition Penalty Date**" is defined in Section 6.1(a).

"**Impositions**" is defined as all Taxes, Assessments, ground rent, if any, water and sewer rents, fees and charges, levies, permit, inspection and license fees and other dues, charges or impositions, including all charges and license fees for the use of vaults, chutes and similar areas adjoining the Land, maintenance and similar charges and charges for utility services, in each instance whether now or in the future, directly or indirectly, levied, assessed or imposed on the Property or Borrower and whether levied, assessed or imposed as excise, privilege or property taxes.

"**Improvements**" is defined in Section 2.1(ii).

"**Individual Key Principals**" is defined as Eugene Monkarsh and Jerry Monkarsh.

"**Indemnitor**" is defined in the introductory paragraph of the Environmental Indemnity delivered to Lender in connection with the Loan.

"**Institutional Investor**" is defined as any bank, savings institution, charitable foundation, insurance company, real estate investment trust, pension fund or investment advisor registered under the Investment Advisors Act of 1940, as amended, and acting as trustee or agent.

"**Insurance Premiums**" is defined as all present and future premiums and other charges due and payable on policies of fire, rental value and other insurance covering the Property and required pursuant to the provisions of this Deed of Trust.

"**Insurance Premiums Deposit Event**" is defined in Section 6.2(b).

"**Insurance Proceeds**" is defined in Section 2.1(ix).

"**Insurers**" is defined in Section 7.1(c).

"**Interest**" is defined as the amount of fixed interest payable under the Note at the Fixed Interest Rate and any other sums which could be deemed to be interest under Law.

"**Key Principals**" is defined as EJM plus the Individual Key Principals.

"**Land**" is defined in the Recitals.

"**Late Charge**" is defined in the Note.

"**Law**" is defined as all present and future codes, constitutions, cases, opinions, rules, manuals, regulations, determinations, laws, orders, ordinances, requirements and statutes, as amended, of any Government that affect or that may be interpreted to affect the Property, Borrower or the Loan, including amendments and all guidance documents and publications promulgated thereunder.

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 64 of 69
Order: 1 Comment:

"**Leases**" is defined as all present and future leases, subleases, licenses and other agreements for the use and occupancy of the Land and Improvements, any related guarantees and including any use and occupancy arrangements created pursuant to Section 365 (h) of the Bankruptcy Code or otherwise in connection with the commencement or continuation of any bankruptcy, reorganization, arrangement, insolvency, dissolution, receivership or similar Proceedings, or any assignment for the benefit of creditors, in respect of any tenant or other occupant of the Land and Improvements.

"**Lender**" is defined in the introductory paragraph.

"**Loan**" is defined in the Recitals.

"**Loan Documents**" is defined as the Note, this Deed of Trust, the Assignment and all documents now or hereafter executed by Borrower or held by Lender or Trustee relating to the Loan, including all amendments.

"**Lockbox Administrator**" is defined in that certain Lockbox Agreement, dated the date of this Deed of Trust, executed by Borrower, Lender and Lockbox Administrator.

"**Lockbox Agreement**" is defined in the Note.

"**Material Environmental Contamination**"is defined as contamination of the Property with Hazardous Substances (i) that constitutes a violation of one or more Environmental Laws; (ii) for which there is a significant possibility that remediation will be required under Environmental Laws; (iii) that results in a material risk of liability or expense to Lender; or (iv) that diminishes the value of the Property.

"**Maturity Date**" is defined in the Recitals.

"**Maximum Interest Rate**" is defined as the maximum rate of interest, if any, permitted by Law to be charged with respect to the Loan as the maximum rate may be increased or decreased from time to time.

"**Note**" is defined in the Recitals.

"**Note Payments**" is defined in the Note.

"**Notices**" is defined in Section 17.1.

"**Obligations**" is defined in Section 3.1.

"**Permitted Exceptions**" is defined as the matters shown in Schedule B, Part 1 and 2 of the title insurance policy insuring the lien of this Deed of Trust.

"**Permitted Transfers**" is defined in Section 12.2(b).

"**Permitted Use**" is defined as use as a commercial industrial, office, warehouse, and distribution complex and uses incidentally and directly related to such use.

CO_DOCS_A #109558 v2

59

"**Personal Property**" is defined as the Property other than Fixtures, the Land or the Improvements.

"**Policies**" is defined in Section 7.1(b).

"**Prepayment Premium**" is defined in the Note.

"**Principal**" is defined in the Recitals.

"**Proceeding**" is defined as a pending or threatened action, claim or litigation before a legal, equitable or administrative tribunal having proper jurisdiction.

"**Proceeds**" is defined in Section 7.2(c).

"**Prohibited Person**" is defined as:

(i)          a person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224;

(ii)          a person or entity owned or controlled by, or acting for or on behalf of, any person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224;

(iii)          a person or entity with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)          a person or entity who commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224;

(v)          a person or entity that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, http://www.treas.gove/ofac/t11sdn.pdf or at any replacement website or other official publication of such list; or

(vi)          a person or entity who is affiliated with a person or entity described in clauses (i)-(v) of this definition.

"**Property**" is defined in Section 2.1.

"**Property Documents**" is defined in Section 2.1(v).

"**Receiver**" is defined as a receiver, custodian, trustee, liquidator or conservator of the Property.

"**Remedies**" is defined in Section 14.2(a).

"**Rents**" is defined as all present and future rents, prepaid rents, percentage, participation or contingent rents, issues, profits, proceeds, parking fees, revenues and other consideration accruing under the Leases or otherwise derived from the use and occupancy of the Land or the

*Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 66 of 69*
*Order: 1 Comment:*

Improvements, including tenant contributions to, expenses, security deposits, royalties and contingent rent, if any, all other fees, accounts, accounts receivable or payments paid to or for the benefit of Borrower, including liquidated damages after a default under a lease, any premium or other termination fee payable by tenant after cancellation of a lease and the proceeds of any rental insurance, and any payments received pursuant to Section 502(b) of the Bankruptcy Code or otherwise in connection with the commencement or continuance of any bankruptcy, reorganization, arrangement, insolvency, dissolution, receivership or similar proceedings, or any assignment for the benefit of creditors, in respect of any tenant or other occupant of the Land or the Improvements and all claims as a creditor in connection with any of the foregoing.

"**Restoration**" is defined as the restoration of the Property after a Destruction Event as nearly as possible to its condition immediately prior to the Destruction Event, in accordance with the plans and specifications, in a first-class workmanlike manner using materials substantially equivalent in quality and character to those used for the original improvements, in accordance with Law and free and clear of all liens, encumbrances or other charges other than this Deed of Trust and the Permitted Exceptions.

"**Restoration Completion Date**" is defined in Section 7.4(viii).

"**Restoration Funds**" is defined in Section 7.5(b).

"**Rollover Letter of Credit**" is defined in Section 5.6(c).

"**Single Purpose Entity**" is defined in Section 13.3(a).

"**SPE Member**" means a corporation that satisfies the covenants set forth in Section 13.3 and is a member of Borrower.

"**Taxes**" is defined as all present and future real estate taxes levied, assessed or imposed against the Property.

"**Term**" is defined as the scheduled term of this Deed of Trust commencing on the date Lender makes the first disbursement of the Loan and terminating on the Maturity Date.

"**Transfer**" is defined in Section 12.1(a).

"**Trustee**" is defined in the introductory paragraph.

"**USA Patriot Act**" is defined as the "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001" (Public Law 107-56).

"**Uniform Commercial Code**" is defined as the Uniform Commercial Code as in effect from time to time in the jurisdiction where the Land is located, or, to the extent required by the Uniform Commercial Code, where the Borrower is located, as applicable.

*Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 67 of 69*
*Order: 1 Comment:*

Exhibit C

RULES OF CONSTRUCTION

(a)     References in any Loan Document to numbered Articles or Sections are references to the Articles and Sections of that Loan Document.  References in any Loan Document to lettered Exhibits are references to the Exhibits attached to that Loan Document, all of which are incorporated in and constitute a part of that Loan Document.  Article, Section and Exhibit captions used in any Loan Document are for reference only and do not describe or limit the substance, scope or intent of that Loan Document or the individual Articles, Sections or Exhibits of that Loan Document.

(b)     The terms "include", "including" and similar terms are construed as if followed by the phrase "without limitation".

(c)     The terms "Land", "Improvements", "Fixtures and Personal Property", "Condemnation Awards", "Insurance Proceeds" and "Property" are construed as if followed by the phrase "Or any part thereof".

(d)     Any agreement by or duty imposed on Borrower in any Loan Document to perform any obligation or to refrain from any act or omission constitutes a covenant running with the ownership or occupancy of the Land and the Improvements, which will bind all parties hereto and their respective successors and assigns, and all lessees, subtenants and assigns of same, and all occupants and subsequent owners of the Property, and will inure to the benefit of Lender and all subsequent holders of the Note and this Deed of Trust and includes a covenant by Borrower to cause its partners, members, principals, agents, representatives and employees to perform the obligation or to refrain from the act or omission in accordance with the Loan Documents.  Any statement or disclosure contained in any Loan Document about facts or circumstances relating to the Property, Borrower or the Loan constitutes a representation and warranty by Borrower made as of the date of the Loan Document in which the statement or disclosure is contained.

(e)     The term "to Borrower's knowledge" is construed as meaning to the best of Borrower's knowledge after diligent inquiry.

(f)     The singular of any word includes the plural and the plural includes the singular.  The use of any gender includes all genders.

(g)     The terms "person", "party" and "entity" include natural persons, firms, partnerships, limited liability companies and partnerships, corporations and any other public or private legal entity.

(h)     The term "provisions" includes terms, covenants, conditions, agreements and requirements.

(i)     The term "amend" includes modify, supplement, renew, extend, replace or substitute and the term "amendment" includes modification, supplement, renewal, extension, replacement and substitution.

CO_DOCS_A #109558 v2                          62

*Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 68 of 69*
*Order: 1 Comment:*

(j)     Reference to any specific Law or to any document or agreement, including the Note, this Deed of Trust, any of the other Loan Documents, the Leases [,] [and] the Property Documents [,] [and] [the Ground Lease] [and the Hotel Operating Agreement] includes any future amendments to the Law, document or agreement, as the case may be.

(k)     No inference in favor of or against a party with respect to any provision in any Loan Document may be drawn from the fact that the party drafted the Loan Document.

(l)     The term "certificate" means the sworn, notarized statement of the entity giving the certificate, made by a duly authorized person satisfactory to Lender affirming the truth and accuracy of every statement in the certificate.   Any document that is "certified" means the document has been appended to a certificate of the entity certifying the document that affirms the truth and accuracy of everything in the document being certified.   In all instances the entity issuing a certificate must be satisfactory to Lender.

(m)     Any appointment of Lender as Borrower's attorney-in-fact is irrevocable and coupled with an interest.   Lender may appoint a substitute attorney-in-fact.   Borrower ratifies all actions taken by the attorney-in-fact but, nevertheless, if Lender requests, Borrower will specifically ratify any action taken by the attorney-in-fact by executing and delivering to the attorney-in-fact or to any entity designated by the attorney-in-fact all documents necessary to effect the ratification.

(n)     Any document, instrument or agreement to be delivered by Borrower will be in form and content satisfactory to Lender.

(o)     All obligations, rights, remedies and waivers contained in the Loan Documents will be construed as being limited only to the extent required to be enforceable under the Law.

(p)     The unmodified word "days" means calendar days.

Description: Maricopa,AZ Post-82 Document-Year.DocID 2002.647149 Page: 69 of 69
Order: 1 Comment: